# UNITED STATES DISTRICT COURT
## SOUTHISN DISTRICT OF FLORIDA

CIVIL DIVISION

CASE NO.: 25-cv-22612-BB

DEMOREE HADLEY,

      Plaintiffs,

v.

DESIREE PEREZ, ROC NATION,
ICONIC CREATIVE, LLC
DANIEL BOBER, NATALIE ANDERSON,
SIG 9, LLC, JAMES FONDO,
STEVEN CADY, JESSICA CADY,
SOUTH BROWARD HOSPITAL DISTRICT,
ODYSSEY BEHAVIORAL HEALTHCARE,
LIFESKILLS SOUTH FLORIDA
OUTPATIENT, LLC, BROWARD COUNTY
SHERIFF'S OFFICE, JORDAN DENIS,
JOSEPH REYES, RACHEL BERSTEIN,
CTS RESEARCH, INC.

      Defendants.          /

## AMENDED COMPLAINT

    Plaintiff, DEMOREE HADLEY, brings this Complaint against DESIREE PEREZ, ROC

NATION, ICONIC CREATIVE, LLC, DANIEL BOBER, NATALIE ANDERSON, SIG 9, LLC,

JAMES FONDO, STEVEN CADY, JESSICA CADY, SOUTH BROWARD HOSPITAL

DISTRICT, ODYSSEY BEHAVIORAL HEALTHCARE, LIFESKILLS SOUTH FLORIDA

OUTPATIENT, LLC, BROWARD COUNTY SHERIFF'S OFFICE, JORDAN DENIS, JOSEPH

REYES, RACHEL BERSTEIN, and CTS RESEARCH, INC., and allege the following:

## THE PARTIES, JURISDICTION, AND VENUE

At all times material to this action:

1.      Plaintiff, Demoree Hadley, was a citizen of the State of Florida and a resident of Miami-Dade County, Florida, which is in the Southern District of Florida.

2.      Defendant, Desiree Perez, formerly known as Desiree Rosa Gonzalez, Desiree Reynoso, and Desiree Lopez, was a citizen of the State of New Jersey.

3.      Defendant, ROC Nation, was a New York, NY corporation engaged in commercial activity throughout the United States, including Florida.  Defendant Desiree Perez was its Chief Executive Officer.

4.      Defendant, Iconic Creative, LLC, was a Florida corporation engaged in commercial activity, including the Southern District of Florida.

5.      Defendant, Daniel Bober, was a citizen of the State of Florida, the Chief Medical Officer of Odyssey Behavioral Healthcare, the Medical Director of Life Skills South Florida Outpatient, LLC, and resided in the Southern District of Florida.

6.      Defendant, South Broward Hospital District, was a public entity incorporated under the laws of the State of Florida and is located in the Southern District of Florida.

7.      Defendant, Odyssey Behavioral Healthcare, was a Tennessee corporation engaged in commercial activity throughout the United States, including the Southern District of Florida.

8.      Defendant, Life Skills South Florida Outpatient, LLC, was a Florida corporation engaged in commercial activity, including the Southern District of Florida.

9.      Defendant, SIG 9, LLC, was a Florida corporation engaged in commercial activity, *i.e.* private investigations, and was headquartered in the Southern District of Florida.

10.     Defendant, James Fondo, was a resident of the State of Florida, a member of Sig 9, LLC, and resided in the Southern District of Florida.

11.     Defendant, Steven Cady, was a resident of the State of Florida, a member of Sig 9, LLC, and resided in the Southern District of Florida.

12.     Defendant, Jessica Cady, was a resident of the State of Florida, a member of Sig 9, LLC, and resided in the Southern District of Florida.

13.     Defendant, Natalie Anderson, was a resident of the State of New York and employed by Roc Nation as Desiree Perez's assistant.

14.     Defendant, Broward County Sheriff's Office, was a public entity incorporated under the laws of the State of Florida.

15.     Defendant, Jordan Denis, was a resident of the State of Florida and employed as a police officer by the Broward County Sheriff's Office.

16.     Defendant, Joseph Reyes, was a resident of the State of Florida and employed as a police officer by the Broward County Sheriff's Office.

17.     Defendant, Rachel Bernstein, was a resident of the State of California and a self-proclaimed cult specialist, but her practice includes conducting Zoom meetings in other jurisdictions, including Florida.

18.     Defendant, CTS Research, Inc., was a New York, NY corporation engaged in commercial activity, including in the Southern District of Florida

**JURISDICTION AND VENUE**

19.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00.

20.     Plaintiff also requests that this Court exercise supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367(a) because they arise out of the same operative nucleus set of facts.  Venue is proper because the majority of events or omissions giving rise to the claims occurred within Miami-Dade County, FL and Broward County, FL, both of which are in the Southern District of Florida.

<b>FACTS GIVING RISE TO THE CLAIMS</b>

21.     This case gives meaning to the phrase, "You wouldn't believe it until you see it."

22.     Desiree Perez ("Desiree") is a former drug trafficker, confidential informant, and convicted felon – and is now the CEO of ROC Nation in New York City.

23.     Demoree Hadley ("Demoree") is Desiree's biological daughter.

24.     Javon Hadley ("Javon") is Demoree's husband.

25.     Demoree met Javon while they attended Miami Palmetto Senior High School.

26.     Demoree and Javon have been together for the past 15 years and got married in 2024.  This Complaint will refer to them collectively as "the Hadleys."

27.     For the past two years, Desiree has used her money, power, and influence to tear the Hadleys apart.

28.     Desiree created an enterprise of individuals to effectuate her plot and used unlawful means to have Javon falsely arrested on three different occasions and Demoree falsely detained under Florida's Baker Act and Marchman Act statutes.

29.     Unfortunately, as detailed below, Desiree has a history of using illegal tactics to get her way, even if it requires wearing rubber gloves and providing false information to authorities.



30.     In addition to being the CEO of ROC Nation, upon information and belief, Desiree is part owner of the company.

31.     ROC Nation was founded in 2008 by music icon Jay-Z and has become one of the most influential entities in the entertainment and sports industries.

32.     ROC Nation represents chart-topping musicians, elite athletes, and influential entertainers, including Rihanna, J. Cole, Shakira, Kevin Durant and Saquon Barkley.

33.     The National Football League contracts ROC Nation to organize and select performers for the Super Bowl halftime show.

34.     ROC Nation also assists artists with creating content for concerts and movies.

35.     Desiree, as CEO, has an army of tech staff with access to the best technology that money can buy.

36.     She also has a team of attorneys and private investigators at her disposal.

37.     Despite her current position, Desiree's background and discreet rise to prominence was highly unusual.

38.     Unfortunately, Desiree's past and her abandonment of Demoree is the root cause of the current friction between a mother and daughter.

39.     Their relationship is unfortunate, sad, and disheartening.

40.     More disappointing, their relationship could have been repaired through alternative means, but Desiree chose to employ heavy-handed tactics instead.

**Desiree's Past as a Drug Trafficker, Confidential Informant, Fraudster, and Fugitive**

41.     Desiree participated in federal drug-trafficking activities in the 1990s, under her prior name, Desiree Reynoso.



Case 0:95-cr-06052-AHS   Document 16   Entered on FLSD Docket 03/11/1999   Page 1 of 3

PROB 12C
(SD/FL 9/96)

**United States District Court**

for

SOUTHERN DISTRICT OF FLORIDA

AMENDED

Petition for Warrant or Summons for Offender Under Supervision

Name of Offender: **Reynoso, Desiree**     Case Number: 94-6162-CR-GONZALEZ
                                                          95-6052-CR-GONZALEZ
                                             Facts #39936

Name of Sentencing Judicial Officer: Jose A. Gonzalez, JR.

Date of Original Sentence: September 18, 1995

Original Offense:   Conspiracy to Distribute Cocaine 21 U.S.C 846
                    Conspiracy to Distribute Cocaine 21 U.S.C 846

42.     Following Desiree's federal Indictment and arrest, she was originally sentenced to 30 months imprisonment.

43.     However, Desiree became a confidential informant and provided information to federal law enforcement, which caused the government to file a motion eliminating her 30-month prison sentence.

13  ORDER as to Desiree Reynoso-Gonzalez, granting govt's m/ Reducing Sentence. The sentence previously imposed on 9/7/95 of 30 months is vacated. The court will withold the imposition of any sentence of incarceration and sentence the deft to 5 years probation and $50.00 special assessment. The sentence in this case is to run concurrently with a similar sentence imposed by this Court in Case No. 94-6162-CR-Gonzalez ( Signed by Judge Jose A. Gonzalez Jr. on 7/11/96) CCAP (kp, Deputy Clerk) (Entered: 07/12/1996)

44.     While engaged in narcotics trafficking activities, Desiree gave birth to Demoree in November 1994.

45.     Even after Demoree's birth, Desiree continued to engage in criminal conduct.

46.     For instance, local law enforcement arrested Desiree in April of 1996 for a slew of fraudulent criminal activity, including organized fraud, grand theft, and several counts of uttering a forged instrument.



| State Case No.: | 13-1996-CF-010573-B000-XX | Name: | REYNOSO, DESIREE ROSA | Date of Birth: | 08/24/1968 |
| Date Filed: | 04/10/1996 | Date Closed: | 10/04/1996 | | |
| Warrant Type: | | Warrant Amount: | $0.00 | | |
| Assessment Amount: | $255.00 | Balance Due: | $0.00 | Stay Due Date: | 06/15/2006 |
| Previous Case: | F-96-011014 | Next Case: | | | |

**≣ Charges**  Total Of Charges: 10

EXPORT TO CSV

| Seq No. | Charge | Charge Type | Disposition |
|---|---|---|---|
| 1 | ORGANIZED FRD/20-50K | FELONY | CONV-PROB SPEC COND |
| 2 | GRAND THEFT 2ND DEG | FELONY | CONV-PROB SPEC COND |
| 3 | GRD THFT/3D/300+/-5K | FELONY | CONV-PROB SPEC COND |
| 4 | UTTER FORGED INSTRU | FELONY | CONV-PROB SPEC COND |
| 5 | GRD THT/3D/10K+/-20K | FELONY | CONV-PROB SPEC COND |
| 6 | UTTER FORGED INSTRU | FELONY | CONV-PROB SPEC COND |
| 7 | GRAND THEFT 2ND DEG | FELONY | CONV-PROB SPEC COND |
| 8 | UTTER FORGED INSTRU | FELONY | CONV-PROB SPEC COND |
| 9 | PROBATION VIOLATION | MISC HOLD | PROBATION REVOKED |
| 10 | PROBATION VIOLATION | MISC HOLD | VOLUNTARILY WTHDRAWN |

47.     When Desiree got arrested on state-court charges, she had already been sentenced to federal prison, but was still out on bond.

48.     Her surrender date got delayed to at least August 12, 1996.  See *United States v. Luis Quintero et al*, SDFL Case No. 94-cr-06162-AHS, [D.E. 208].

49.     As shown on her federal probation affidavit, Desiree later fled to New York while on probation and became a fugitive from justice.

50.     In March of 1998, New York officials arrested Desiree for grand larceny, criminal use of drug paraphernalia, and criminal possession of a firearm.

7

51.     Desiree pled guilty in New York state court, but was only sentenced to a conditional discharge.[1]

```
The Hon. Jose A. Gonzalez
March 5, 1999
Page 2
                        RE: REYNOSO, DESIREE



    Violation of a Mandatory Condition, by failing to
    refrain from violation of the law.  On or about
    March 5, 1998 in Kings County New York, while a
    fugitive, the probationer was arrested by the
    New York City Police Department, Precinct 071,and
    charged with Grand Larceny, Criminal Use of Drug
    Paraphernalia and Criminal Possession of a
    Firearm.  On July 9, 1998, the probationer pled
    guilty in docket number 98K018921 in Kings County
    Court which ordered a conditional discharge
    sentence on July 9, 1998.
```

52.     Desiree was eventually sentenced to 9 months imprisonment for violating federal probation.

53.     Choosing a life of crime over motherhood, Desiree dumped her infant daughter Demoree on Demoree's maternal grandfather, Julio and his longtime partner Olga.

54.     Growing up, Demoree referred to Julio as "Abuelo" and Olga as "Mami," which Desiree despises to this day.

55.     In 2002, almost fresh out of prison, Desiree somehow became the owner of the 40/40 club in New York.

---

[1] Upon information and belief, Desiree avoided a lengthy prison sentence by cooperating with law enforcement.

```
40/40 CLUB (New York) - BUSINESS RECORD

40/40 CLUB (Trade Style)                              255 W 36TH ST RM 1001, NEW YORK, NY 10018-7720 (NEW Y
TWENTY ONES INCORPORATED (Primary)                    COUNTY) (07/20/2002 to 01/11/2024)
Link Number: 665486825                                  Phone
FEIN: None Found                                            (212) 989-0040 (ET) - 40/40 CLUB
D-U-N-S® Number: 13-309-7365                           255 W 36TH ST STE 1501, NEW YORK, NY 10018-7757 (NEW
Industry: Drinking Places                             COUNTY) (07/20/2002 to 01/11/2024)
Vehicle Count: 2                                        Phone
Judgment Debtor Count: 9                                    (212) 989-0040 (ET) - 40/40 CLUB
Principals Count: 5                                    540 W 26TH ST, NEW YORK, NY, 10001-5504 (NEW YORK CO
                                                      (07/20/2002 to 01/11/2024)
                                                       Phone
                                                           (212) 989-0040 (ET) - 40/40 CLUB
                                                      6 W 25TH ST, NEW YORK, NY 10010-2703 (NEW YORK COUN
                                                      (07/20/2002 to 01/11/2024)
                                                       Phone
                                                           (212) 989-0040 (ET) - 40/40 CLUB

Principals
DESIREE PEREZ [ View Person Record ] Title: OWNER
255 W 36TH ST STE 1501, NEW YORK, NY 10018-7757 (NEW YORK
COUNTY)
DESIREE PEREZ [ View Person Record ] Title: OWNER
6 W 25TH ST, NEW YORK, NY 10010-2703 (NEW YORK COUNTY)
```

56.     Desiree has mostly remained in the greater New York City area since then and chose money, power, and influence, at all costs.

57.     To the outside world, it appears that Desiree turned her life around and became a successful CEO.

58.     But secretly, Desiree continued to engage in acts exposing herself and others to both civil and criminal liability, which a state prosecutor noted in her closeout memorandum relating to Javon's fraudulent arrest.[2]

> The Victim's Mother called in a false 911 call in December, which is a crime in and of itself, and reported the Victim was getting kidnapped. The Victim's Mother also petitioned to have the Victim Marchman acted and the Victim was Baker Acted. The Witnesses, under oath, told ASA Sopena and ASA Farrell that the Victim does not do drugs or drink (*See Witnesses prefile blue tab 5*). The Marchman act was voluntarily withdrawn April 5th, the day the Defendant was arrested for case M24007363. The Victim on April 16, 2024, testified under oath

59.     As related to this lawsuit, Desiree conspired with others to illegally record the Hadleys in their bedroom, hack Demoree's iPhone, and unlawfully detain the Hadley's on several occasions – which included concocting false evidence against them.

60.     Candidly, it is difficult to imagine that a mother would do the acts listed below to her own child, but the screenshots included in this Complaint prove otherwise.

_____

[2] In the closeout memo, Desiree is the "victim's mother" and Demoree is the alleged "victim."

### *Desiree Unlawfully Wiretapped Demoree and Javon's Bedroom*

61.     Desiree, at an unknown time, conspired with others to surreptitiously plant a camera into the Hadleys' bedroom without their knowledge or authorization, which existed since at least July 18, 2022.

62.     Desiree intentionally intercepted video and/or recordings from the camera she placed in the Hadleys' bedroom and tried to use the recordings against Javon.

63.     Desiree somewhat admitted this fact in a frivolous lawsuit she filed against Javon. See *Perez et al v. Hadley*, SDFL Case No. 25-cv-21697-RAR, [D.E. 1, ¶ 78].

64.     In her Complaint, Desiree even included a snapshot from the illegal recording device in the Hadley's bedroom. *Id*.



65.     In addition to the illegal camera, Desiree also planted a listening device (a part of which is pictured below) inside their bedroom.



66.     Desiree used a listening device to intentionally intercept or procured another person to intercept Demoree's private conversations with Javon and others.

67.     Desiree recorded Demoree's private conversations, which occurred in Demoree's bedroom, and even submitted those recordings to the prosecutor in Javon's misdemeanor battery case.

68.     The prosecutor even recognized the illegal act of recording the Hadleys in their bedroom. [3]

> *iii. Illegal Recording: Audio from September 11th, 2023*
>
> There is an audio recording of the September 11, 2023 incident. This recording is an illegal recording and even still, inconclusive of a battery. The recording captures the Defendant yelling at the Victim and it sounds like the Victim says, "don't hurt me". In another illegal recording the Victim confides in a friend that the Defendant grabbed her neck. This would not explain the redness on the check and is not fully consistent with what the Witnesses saw when they walked in. However, the Victim's conversation with her friend is also part of an illegal recording and is further hearsay.

69.     Unbeknownst to the Hadleys, Desiree kept both recording devices in their bedroom for years, which is clearly illegal.

---

[3] In the prosecutor's memo, Javon is the alleged defendant, Demoree is the alleged victim, and Desiree is the one who conspired with others to illegally record the Hadleys.  Notably, although a camera has been in the Hadleys' bedroom since July 18, 2022, Desiree failed to produce a single video showing Javon physically assaulting Demoree on September 11, 2023.

70.     Demoree and Javon did not discover the recording devices until after the prosecutor wrote their closeout memorandum in late 2024.

*Desiree Illegally Hacked Demoree's iCloud Account*

71.     Desiree also hacked, or directed her highly trained technical staff at ROC Nation to hack, Demoree's iCloud account, giving Desiree unfettered access to Demoree's digital data, including text messages, photographs, and videos.

72.     Desiree knew that Demoree was in Florida at the time and that Demoree's phone would upload data and images captured in Florida to her iCloud account.

73.     Demoree did not authorize Desiree to do so.

74.     Demoree has witnessed her mother direct her tech team at ROC Nation to infiltrate other people's digital data without their permission, including an instance where Desiree wanted to determine how a chart-topping artist's upcoming movie got leaked.

75.     Roc Nation employs or contracts with advanced tech gurus to advance their goals in the music and entertainment business, including using questionable technological means.

76.     In other words, ROC Nation has employees and/or contracts whose job is to frequently manipulate digital data to control the narrative in any given situation.

77.     Demoree first realized her mother hacked her iPhone on March 1, 2024.

78.     On that day, Javon and one of Demoree's best friends called Demoree after noticing that Demoree's cell phone and Apple Watch were pinging in New York.[4]

---

[4] Demoree voluntarily gave Javon and her best friend access to her location. The screenshot below is from Javon's phone, showing that Demoree was supposedly in New York.



79.     Demoree's Apple Watch also showed its was located at 538 West 26 Street in New York.



80.     When Demoree checked her iCloud account on her phone, which she had in her hand in Miami, it showed that "iPhone(2)" on her account was pinging to ROC Nation's headquarters in New York.

13



81.     The problem is that Demoree only had one iPhone device attached to her iCloud account – the one she was literally holding in her hand.

82.     Not surprisingly, Desiree's office at ROC Nation is located at 540 West 26 Street, New York, NY.



83.     Google Maps shows that 538 West 26 Street – the location appearing on Demoree's iCloud account – and 540 West 26 Street, which is ROC Nation's headquarters, are literally part of the same building in New York.



84.     Demoree believes the "iPhone (2)" device in her iCloud account, which placed her location at ROC Nation in New York, was a device cloned by her mother's team to access and manipulate the data stored in her account.

85.     Again, Demoree has personally witnessed her mother order her team to "clone" a person's iPhone for her access.

86.     In Desiree's frivolous lawsuit recently filed against Javon, she somewhat admitted to hacking Demoree's phone.  Desiree filed screenshots of text messages between Demoree and Javon, but failed to adequately explain how she acquired them.  See *Perez et al v. Hadley*, SDFL Case No. 25-cv-21697-RAR, [D.E. 1, ¶¶ 31, 33, 37, 38, 57].

87.     The prosecutor in Javon's case even noted the oddity of Desiree's ability to provide private conversations between Demoree and Javon that dated back to 2017:

> The Victim is very concerned with the conduct of her family. The Victim found a tracker in her luggage, and believes she was followed to the SAO when she came in for her pre-file statement. When the Victim came into the SAO, an attorney for the Witnesses also appeared and inquired with the receptionist as to the whereabouts of the Victim. (*See letter from Victim Binder yellow tab 13*). The Victim claims her family has hacked her Icloud account and accessed her private data and information. The Victim's Mother provided the State with a Google Drives of evidence which contained private conversations that the Victim had with the Defendant, dating as far back as 2017.

88.     Desiree, and/or her staff or contractors at ROC Nation, used high-tech software to access and manipulated text messages, photographs, and videos.

89.     Desiree used the manipulated data described about and other illegal bedroom recordings, stolen iCloud data, and other means during her conspiracy to fraudulently convince people that Demoree needed to be unlawfully committed to a mental health institution and drug rehab facility under Florida's Baker Act and Marchman Act statutes; she used the same information to get Javon falsely arrested.

### *Desiree Threatened to Baker Act Demoree*

90.     Desiree's first time threatening to commit (wrongfully) Demoree to a mental health institution occurred on September 14, 2023.

91.     That day, Desiree lured Demoree to her home in Pinecrest, Florida, under the false pretenses that Demoree's uncle needed to be taken to the hospital, which was untrue.

92.     Demoree rushed to her mother's home and was confronted by her mother for an "intervention."

93.     As seen below in the snippet from the police report[5], Desiree admitted to having an "intervention" for Demoree, and that she hired a "counselor" named Victoria Hunter.

> Contact was then made with Ms. Desiree Perez (involved other) who advised she is the mother of Ms. Lopez. Ms. Perez advised that she brought a counselor over named Ms. Victoria Hunter (involved other) with the family to have an intervention for her daughter, Ms. Lopez.

94.     Although Desiree told officers that Victoria Hunter is a therapist, Ms. Hunter has never been a licensed therapist in Florida.  Desiree convinced Ms. Hunter to lie to the police and falsely claim she was a therapist.

95.     Demoree was not interest in her mother's "intervention" and demanded to leave.

96.     However, Desiree prevented Demoree from leaving by confiscating her dog.

97.     Desperate to leave, Demoree attempted to climb over her mother's security fence.

---

[5] When the police authored the incident report, the Hadleys were dating and had not yet married. The report refers to Demoree as "Ms. Lopez."

98.     Desiree pulled Demoree back and stated, "I am going to Baker Act you… if you stay with that nigger.  I will have you committed."

99.     Desiree's statement was not some veil threat and later came to fruition, as explained below.

100.     Demoree called 911 and requested police assistance.

101.     Desiree flaunted her power as the CEO of ROC Nation and claimed she had the Pinecrest police "in her pocket."[6]

102.     Pinecrest police officers arrived on scene and eventually forced Desiree to allow her daughter to leave, but due to her influence, the officers did not press charges against Desiree for false imprisonment.

103.     The same day, Desiree showed up to Demoree's grandfather's home, where the Hadleys were residing.

104.     Desiree confronted Javon and told him, "I know everything that happens with you and Demoree.  If you stay with her, you're going to get yourself killed."

105.     Based upon Desiree's threats, the Hadleys moved out of Demoree's grandfather's home on October 1, 2023, and into a home located in Homestead, Florida.

***Desiree Hired CTS Investigators to Stalk the Hadleys***

106.     In response to Demoree moving out, Desiree rented the house directly across the street from the Hadleys in Homestead, pointed a camera towards their home, and hired private investigators (many who were unlicensed) to stalk and harass the Hadleys.

---

[6] As shown below, Desiree frequently used her financial resources, power, and influence to cause police officers to do as she asked.

107.    The investigators who stalked the Hadleys from across the street, at Desiree's direction, worked for CTS Research, Inc. ("CTS") in New York City.

108.    CTS engages in commercial activities in Florida.

109.    CTS investigators followed the Hadleys 24 hours a day, 7 days a week.

110.    Many times, the CTS investigators followed the Hadleys at unsafe distances in their cars, causing the Hadleys to fear for their safety while driving.

111.    CTS hired Justin Gonzalez, Jeff Brown, Jose Alonso, Richard Alonso, Steven Victor, and Elmer Foster to live in the home across from the Hadleys to surveillance them.

112.    The Hadley have photos, videos, license tag numbers, background reports, and PI credentials, identifying some of the men working for CTS.



Following DH and taking photos and videos everywhere she went and from across the street where CTS Research employees lived for months to stalk the Hadley's.



 

113.    In addition to the CTS employees living across from the Hadleys, CTS engaged other investigators to conduct illegal surveillance.

114.    For instance, Amauris Bastidas ("Bastidas"), a CTS employee, conducted non-stop surveillance on the Hadleys.

115.    Bastidas followed the Hadleys every day and took countless photographs and videos of them in late 2023 and in 2024.

116.    Bastidas' conduct (and other CTS investigators) became so egregious that the Hadleys called the police on them.

117.    In March 2024, the Miami-Dade Police Department stopped Bastidas after stalking Javon (Bastidas stalked Demoree too).

118.    Bastidas identified himself as an investigator working for CTS Research, which was captured on BWC footage.



119.    Bastidas admitted that he was hired by CTS to "follow the Hadleys."

120.    Bastidas had a firearm laying on the seat.

121.    The police officer asked Bastidas whether he had an active private investigative

license or security license, which is required under Florida Law.

PART II
PRIVATE INVESTIGATIVE SERVICES

493.6201   Classes of licenses.
493.6202   Fees.
493.6203   License requirements.

**493.6201     Classes of licenses.**—
    (1)   Any person, firm, company, partnership, or corporation which engages in business as a private investigative agency shall have a Class "A" license. A Class "A" license is valid for only one location.
    (2)   Each branch office of a Class "A" agency shall have a Class "AA" license. Where a person, firm, company, partnership, or corporation holds both a Class "A" and Class "B" license, each additional or branch office shall have a Class "AB" license.
    (3)   Any individual who performs the services of a manager for a:
    (a)   Class "A" private investigative agency or Class "AA" branch office shall have a Class "MA" license. A Class "C" or Class "M" licensee may be designated as the manager, in which case the Class "MA" license is not required.
    (b)   Class "A" and "B" agency or a Class "AB" branch office shall have a Class "M" license.
    (4)   Class "C" or Class "CC" licensees shall own or be an employee of a Class "A" agency, a Class "A" and Class "B" agency, or a branch office. This does not include those who are exempt under s. 493.6102, but who possess a Class "C" license solely for the purpose of holding a Class "G" license.
    (5)   Any individual who performs the services of a private investigator shall have a Class "C" license.

122.    Bastidas told the police he did not have a valid PI license.

123.    The police contacted Ken Brown, who is the supervising manager at CTS.

124.    BWC footage shows Ken Brown providing officers with his name, number, and the company name, *i.e.* CTS Research.

125.    Ken Brown informed officers that CTS has many offices in Florida.

126.    Ken Brown called CTS's owner, Sean Crowley, and asked which of the many Florida addresses he should provide.

127.    Ken Brown then provided CTS's address as: 1021 Hillsboro Mile, Suite 602 Hillsboro Beach, FL.

128.    When police told Ken Brown that Bastidas was conducting unlawful surveillance, which could be considered stalking, Ken Brown informed the police that he was not sure if Bastidas had a license and apologized.

129.    Ken Brown then name dropped the State Attorney and fraudulently claim that the State Attorney was going to arrest Javon for Human Trafficking.

130.    Police did not arrest Bastidas for stalking, but did cite him for unlawful exposure of a firearm.

131.    The Hadleys later reported Bastidas to the Florida  Department of Agriculture, which conducted an investigation.

132.    The investigation revealed that Bastidas did not have his private investigator license or any license to conduct any surveillances per Florida Statue.

21

**ADMINISTRATIVE COMPLAINT**

COMES NOW the Department of Agriculture and Consumer Services, Division of Licensing, pursuant to Section 493.6121, Florida Statutes, and states that it is the licensing authority as defined therein, that it has statutory jurisdiction over the Respondent, and alleges:

The last known name and address of the Respondent is:

Amauris R. Bastidas


Respondent holds the following license(s) issued pursuant to Chapter 493, Florida Statutes:

D 3317781, G 3303776

As set forth below, Petitioner has received information that justifies action provided for in Section 493.6118(2), Florida Statutes.

**Count I**

On or about 03/28/2024, in Miami-Dade County, Respondent performed the services of a private investigator without a valid Class "C" Private Investigator License. Respondent is in violation of Section 493.6118(1)(g), Florida Statutes.

WHEREFORE, Petitioner intends to take disciplinary action pursuant to Section 493.6118(2), Florida Statutes, including, but not limited to a reprimand, probation, administrative fine, suspension of license, or revocation of license.

133.    The Department of Agriculture fined Bastidas and CTS for their conduct.

134.    Additionally, Desiree, through CTS, hired Raymond Gonzalez – another unlicensed private investigator – to conduct illegal surveillance on the Hadleys.

135.    The Hadleys possess photographs, videos, a criminal aggravated stalking police report, BWC footage, a state attorney prefile conference interview, and an interview/investigation conducted by the Department of Agriculture, reflecting that Raymond Gonzalez was conducting an illegal surveillance on the Hadleys and impersonating a private investigator without a valid C private investigator license.



136. Raymond Gonzalez admitted that CTS knowingly employed licensed and unlicensed investigators to live across the street from the Hadleys and surveillance them 24 hours a day, following them, and take photos and videos of them.

137. BWC footage also captured Raymond Gonzalez identifying himself to police as a private investigator and admitted to residing across the street from the Hadleys.



138.   It is important to note that the BWC capturing Gonzalez's interaction with police

is dated April 8, 2024.  Gonzalez license expired January 8, 2024, several months earlier.



139.   Sean Crowley, owner of CTS, sent a letter to the Department of Agriculture,

essentially admitting that he negligently allowed Raymond Gonzalez  to surveillance the Hadleys

for months without a license.



140.    This is not a slight lapse, as Sean Crowley claims in his letter.

141.    CTS had plenty of time to ensure proper licensing for its investigators.

142.    Furthermore, when MDPD stopped Amauris Bastidas just two weeks earlier and informed Sean Crowley about unlicensed investigators stalking the Hadleys with firearms, he should have confirmed that all CTS private investigators assigned to the case were licensed and trained.

143.    Sean Crowley did not, which is negligence by  CTS.

144.    CTS caused the Hadleys severe emotional distress, PTSD from being followed illegally 24 hours a day, stalking them from across the street where they were living for months, parking in front of Javon's work sites, and taking photos/videos of the Hadleys, their relatives some who are children ages 3, 8,10, and 12, business clients, and friends.

145.    The Hadleys lost two commercial contracts due to CTS employees following them, taking photographs of anyone they spoke to, and questioning relatives and friends with false accusations that defamed the Hadleys.

146.    The Hadleys lived in constant fear for their lives, unable to travel  out of the State

of Florida and unable to live a normal life.

147.   Demoree even called the police on three separate occasions to report Gonzalez's aggravated stalking, which caused her extreme fear for her safety due to men watching her, stalking her, and following her from across the street.

148.   The Hadley had to see psychologists for PTSD symptoms, insomnia, stomach issues, irritability, migraines, appetite suppression, and severe stress for the multiple months of illegal surveillance.

### *Desiree Conspired with Demoree's Employer, Iconic Creative, LLC*

149.   After her first plot to Baker Act Demoree failed, Desiree upped the stakes to have Demoree committed.

150.   Since January 2021, Demoree worked for a creative agency in Miami called Iconic Creative, LLC ("Iconic").  Of course, Iconic often collaborated with ROC Nation.

151.   For two and a half years, Demoree's salary at Iconic was approximately $65,000.00 and the company was in financial distress – a fact the owners shared with Demoree.

> So we are dealing with a lot.
>
> We are in a bad place
>
> 45k
>
> Yesterday the photographer from Zion in New Orleans was was not paid either 14k
>
> AJ had not been paid in months

152.   But in October 2023, right after Desiree threatened to Baker Act Demoree if she did not leave Javon, Demoree received a salary increase from $65,000.00 to $125,000.00.

153.   Upon information and belief, Desiree stepped in and helped resolve Iconic's financial problems – with strings attached, *i.e.* controlling Demoree.

154. Demoree found it odd because she knew about the company's financial situation.

155. She was also ecstatic about her pay increase, of course. But little did she know what was to come.

156. Suddenly, Iconic began asking Demoree to stay late, work longer hours, and to frequently travel.

157. While some of the demands made sense at the time, because of the pay increase, Demoree did not realize that a nefarious plot was on the way, *i.e.* split up Demoree and Javon.

158. On December 12, 2023, Elizabeth "Liz" Fragela and Benigno "Benny" Fragela, the owners of Iconic, sent Demoree a last-minute text at 11:18 p.m., stating that she needed to attend a meeting with the Nike Academy the following day, *i.e.* December 13, 2023.



159. Demoree found it odd that Liz and Benny asked her to attend a Nike Academy meeting because the Nike Academy was revamping its workshops.

160. When Demoree signed onto Zoom, only one person, Rachel "Thomas," was at the "training."

161. Demoree found this to be odd because <u>every</u> other training/meeting with the Nike Academy consisted of at least 20 people.

162.    Rachel "Thomas" signed onto Zoom and intentionally identified herself as a representative from the Nike Academy, which was false.

163.    Rachel then began asking Demoree questions that were unrelated to work.

164.    Demoree answered many of Rachel's questions.

165.    Demoree, suspicious of Rachel's intent, later asked Rachael if she could record the conversation.  Rachael consented.

166.    Demoree recorded the conversation and took a screenshot of Rachel.



167.    Rachael proceeded to give Demoree a quasi-psychological evaluation without Demoree's approval or consent.

168.    Upon information and belief, Desiree conspired with Liz and Benny, the owners of Iconic, to have Demoree undergo a mental health evaluation with Rachel.

169.    After the "training," Demoree asked for Rachel's Nike Academy profile.  Rachel agreed to provide it, but did not do so immediately – probably because it had not been created.

170.    A few days later, Demoree received a fake link showing Rachel's false affiliation with the Nike Academy.



171.    Upon information and belief, Desiree, and/or Liz and Benny, asked someone to create the fraudulent website.

172.    The website was later deleted after Liz and Benny realized that Demoree was becoming suspicious.

173.    Liz and Benny required Demoree to attend two other "training sessions" with Rachel "Thomas."  The last one occurred right before Christmas.  At the time, Demoree did not know Rachel's true identity.

174.    In reality, Rachel "Thomas'" was really a woman named Rachel Bernstein.

175.    Rachel Bernstein is a licensed marriage and family therapist from California who specializes in sexual cults and has a podcast on sex-cult recovery.





176.    Rachel intentionally failed to inform Demoree that she was a sex-cult therapist from California.

177.    Although headquartered in California, Rachel clearly provides services throughout the United States, as indicated on her website, and as she did in this case.

178.    Upon information and belief, this "training session" was just a ploy by Desiree to have Demoree improperly evaluated.

179.    Suffice it to say, Rachel Bernstein was never associated with the Nike Academy when Demoree attended the "training session."

180.    Demoree has suffered emotional distress from this incident and must pay for counseling sessions.

### *Desiree Immediately Conspired to Have Javon Arrested*

181.    On December 26, 2023, less than a week after the forced sessions with Rachael failed, Desiree reported to Miami-Dade police that Javon battered Demoree on January 16, 2022, almost two years prior.

182.    On December 29, 2023, Officers respond to the Hadley's home[7]  to speak with Javon.  Demoree answered the door and told the officers that nothing happened on January 16, 2022, and directed the police to leave if they did not have a warrant.

183.    The next day, December 30, 2023, Desiree ordered private investigators to follow the Hadleys to Pinto Farms in Homestead, FL.

184.    While the Hadleys were enjoining Pinto Farms with their nephews, Desiree falsely reported to 911 that Javon *kidnapped* Demoree and was holding her hostage.

| NARRATIVES | | |
|---|---|---|
| Written By: mdpd\U3010206 | NARRATIVE | Date and Time: 12/30/2023 2:17:24 PM |

ON SATURDAY DECEMBER 30, 2023 AT 1:07PM, I WAS DISPATCHED IN EMERGENCY MODE TO THE PINTO FARM LOCATED AT 14890 SW 216TH STREET IN REFERENCE TO A FEMALE BEING FORCED INTO A DODGE CHARGER WITH A FLORIDA TAG OF IXFQ78 CALLED IN BY AN ANONYMOUS COMPLAINANT.

UPON ARRIVAL, THE VEHICLE WAS LOCATED UNOCCUPIED IN THE PARKING LOT OF THE PINTO FARM. UNITS WERE THEN APPROACHED BY A MALE WHO IDENTIFIED HIMSELF AS JEFF BROWN, A PRIVATE INVESTIGATOR.

HE STATED THAT THE MALE THAT EXITED THE VEHICLE IS WANTED IN A DOMESTIC CRIMES CASE.

185.    As shown in the screenshot below, Desiree's allegations were completely false. Demoree was hardly being abducted and was spending quality time with her soon-to-be husband and nephews.

---

[7] Mrs. Perez also requested officers to respond on December 26, 2023, but the Hadleys were not home.



186.    The State Attorney's Office documented Desiree's criminal act of falsely reporting

a crime.  In their closeout memorandum, the prosecutor stated:

> The Victim's Mother called in a false 911 call in December, which is a crime in and of
> itself, and reported the Victim was getting kidnapped. The Victim's Mother also petitioned to
> have the Victim Marchman acted and the Victim was Baker Acted. The Witnesses, under oath,
> told ASA Sopena and ASA Farrell that the Victim does not do drugs or drink (*See Witnesses
> prefile profile blue tab 5*). The Marchman act was voluntarily withdrawn April 5th, the day the
> Defendant was arrested for case M24007363. The Victim on April 16, 2024, testified under oath

187.    When the officers arrived on scene, they quickly realized Desiree lied to the police,

as recognized by the State Attorney's Office.

188.    However, Desiree had already conspired with high-ranking members of the police

department and others to falsely arrest Javon for the January 2022, alleged battery.

189.    Although the prosecutor ultimately dropped the charges against Javon, he was

embarrassed that the police arrested him in front of his nephews.



190.   Desiree avoided any charges for falsely reporting a kidnapping.

***Back to Iconic's Plot with Desiree***

191.   Approximately one week after Javon was released on bond from his fraudulent

arrest on December 30, 2023, Iconic fired Demoree without any explanation.

192.   Demoree's firing was bizarre - she had just received glowing reviews from Liz.



193.   Upon information and belief, Desiree demanded that Liz and Benny fire Demoree.

194.     Again, Iconic has a large contract with ROC Nation and its artists,[8] and upon information and belief, Desiree stepped in to help them financially.

195.     In addition to firing Demoree, Iconic refused to pay her for the weeks she had already worked in December 2023.

196.     Demoree was told that, to receive payment for the weeks she worked, she had to sign what was essentially a gag order entitled, "separation of release," which precluded her from reporting Iconic's behavior to Nike.  This was obviously illegal.

197.     Demoree had to threaten legal action to get paid for time she had already worked.

***Desiree Hired an Attorney "for Demoree"***

198.     That same week, Desiree hired attorney Brett Schwartz to improperly influence Javon's misdemeanor battery case.

199.     On January 8, 2024, Brett Schwartz filed a notice of appearance, purporting to represent Demoree, when Desiree actually hired him for her own interests.

Filing # 189311293 E-Filed 01/08/2024 03:36:57 PM

IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

STATE OF FLORIDA,
       Plaintiff,

    v.

JAVON HADLEY,
       Defendant.
_____/

CASE NO.:  M223-25900
JUDGE: LORENZO KLUKAS

**NOTICE OF APPEARANCE ON BEHALF OF CRIME VICTIM PURSUANT TO ARTICLE
I, SECTION 16 OF THE FLORIDA CONSTITUTION AND
DESIGNATION OF EMAIL ADDRESS**

COMES NOW, undersigned attorney, **Brett M. Schwartz, Esq.**, hereby respectfully notifies the Clerk of Court and all parties of his appearance as counsel for **Demoree Lopez Perez** and requests to be notified via e-service of all proceedings and filings throughout the duration of the case.

---

[8] The children of Iconic's owners are athletes who wish to be represented by ROC Nation Sports.

200.    To be clear, Demoree never hired Brett Schwartz, nor has she ever talked to him.

201.    Nevertheless, Brett Schwartz filed a fraudulent notice of appearance, which caused the prosecutor in Javon's case to reach out to him.

> **To:**          Brett Schwartz
> **Subject:**     M23025900 HADLEY, JAVON
>
> Good afternoon,
>
> I am the prosecutor in the above referenced case. I saw that you filed a notice of appearance in the case on behalf of the Victim in this case. I would like to speak to your client regarding the above referenced case and schedule a Prefile conference. Please let me know if I have consent to speak with Ms. Lopez by Thursday, 2/1/2024 by 3:00 PM. Thank you in advance.
>
> Best,
>
> **Alanis Alvarez**
> **Assistant State Attorney**
> **Misdemeanor Domestic Violence Unit**

202.    Unfortunately, this was not the only occasion that Desiree hired lawyers who pretended as if they were representing Demoree, as explained below.

203.    At Desiree's direction, Brett Schwartz tried to convince prosecutors to charge Javon with *human trafficking*, although there was no legal basis to do so.

204.    The excerpt below is taken from an email that Brett Schwartz sent to the prosecutor in Javon's *misdemeanor* battery case.

> As a result of this arduous history of manipulation, I will be reaching out to ASA Nicolas Chavez and/or ASA Brenda Mezick, who is the chief of the Human Trafficking unit to request they investigate and pursue felony charges against Mr. Hadley for Human Trafficking, at the very least (both have been copied).

205.    There was absolutely no basis for anyone to pursue felony charges against Javon for human trafficking.

206.    Desiree was simply using her money, power, and influence to prevent the Hadleys from being together.

207.    Desiree even contacted the prosecutor directly using her ROC Nation business email.

208.    After the prosecutor told Desiree and Brett that she could not charge Javon, Desiree asked the prosecutor to improperly extend the case.

209.    Desiree wanted to keep Javon "on edge":

> On Feb 1, 2024, at 6:38 PM, Desiree Perez
> <dperez@scarterenterprises.com> wrote:
>
>
> Right, perhaps even postponing and saying they are
> investigating whatever they feel they can say so that he at
> least stays on edge,

210.    Unfortunately, the prosecutors agreed to Desiree's demand for more time, which ultimately allowed her to continue to wreak havoc on the Hadleys.

211.    Desiree did just that.

### *Desiree's Third Attempt at a Mental Health Evaluation*

212.    On March 26, 2024, after the "intervention" with Victoria Hunter and "training" with Rachel Bernstein failed, Desiree directed Natalie Anderson, a ROC Nation employee, to confront Demoree's therapist, Dr. Luz Berrio, who Demoree was seeing for grief counseling after her aunt died.[9]

213.    Natalie Anderson presented Dr. Berrio with a fabricated audio recording of a woman screaming, "Don't rape me!"

214.    At Desiree's direction, Ms. Anderson falsely claimed the recording was Javon raping Demoree.

215.    Desiree wanted Dr. Berrio to believe that Demoree had some type of mental health issue to capitalize on her threat to Baker Act Demoree.

---

[9] The woman was not technically Demoree's aunt.  However, the woman played an integral role in raising Demoree, including going to parent teacher conferences.

216.    Since Dr. Berrio was intimately familiar with Demoree, and had seen her on countless occasions, she knew that Demoree had never been a threat to herself or others, was not in danger, and did not meet the Baker Act criteria.

217.    Dr. Berrio refused to do Desiree's "dirty work."

218.    After learning about Demoree's false Baker Act, as explained below, Dr. Berrio wrote a letter disputing Demoree's supposed need for treatment or hospitalization.

> To Whom it May Concern:
>
> I have been working with Ms. Demoree Lopez since July of 2022 providing individual sessions. Throughout our therapeutic work, there has been no evidence of visual, auditory, or tactile hallucinations. She has consistently presented as intelligent and coherent. In addition, throughout our clinical work I have not found reason to recommend hospitalization due to any suspected thought disorder.
>
> Regards,
>
> Dr. Luz Maria Berrio
> Licensed Clinical Psychologist
> PY#7497

219.    Demoree had to use her consultation time with Dr. Berrio to discuss Desiree's abhorrent conduct, which obviously cost money and added trauma to an already difficult situation.

### *Desiree's Fourth and Successful Attempt to Unlawfully Detain Demoree*

220.    On March 27, 2024, after striking out with Dr. Berrio, Victoria Hunter and Rachel Bernstein, Desiree conspired with (and likely provided compensation to) Dr. Daniel Bober to wrongfully commit Demoree to a mental health facility under Florida's Baker Act statute.

221.    Dr. Bober was employed as the Chief of Psychiatry at Memorial Regional Hospital,[10] a state-run facility.

---

[10] Dr. Bober was also the Chief Medical Officer for Odyssey Behavioral Healthcare, and the Medical Director of Life Skills South Florida Outpatient, LLC.

222.     Desiree and her co-conspirators' plan to Baker Act Demoree was sickening.

223.     Desiree hired private investigators – Steven Cady, Jessica Cady, and James Fondo, all owners of Sig 9, LLC – to lure Demoree to a marina in Dania Beach.

224.     One of the Sig 9, LLC investigators called Demoree, pretending to be a property owner who wanted to hire the Hadleys' landscaping company.

225.     Sig 9, LLC placed a GPS tracker on Demoree's car to follow her movements – a fact that James Fondo later admitted to the police on camera.

226.     When Demoree got close to the marina for the "business meeting," James Fondo, a former police officer, conspired with a sergeant from the Broward County Sheriff's Office ("BSO") to have police officers respond to the side of the road near the marina to force a Baker Act upon her.



227.     Officers Jordan Denis and Joseph Reyes from BSO arrived at approximately 5:40 p.m.

228.     James Fondo told Officers Denis and Reyes that Dr. Bober, who was waiting at the meeting spot in the marina, was going to Baker Act Demoree.

229.    It is important to note that James Fondo said "[Dr. Bober **is**] going to Baker Act [Demoree]," even before he ever met her.

230.    In other words, Dr. Bober had no factual basis to initiate a Baker Act because he had never evaluated Demoree beforehand.  At that point, he had not even seen her in person.

231.    But since Desiree hired, conspired, and likely paid Dr. Bober and the members of SIG 9 to commit Demoree under the Baker Act statute, they were going to do exactly just that, no matter the circumstances.

232.    James Fondo insinuated to the officers that their sergeant, the one James Fondo conspired with, directed them stand by to assure that Demoree went with the Sig 9 investigators.

233.    Demoree then drove by James Fondo and the officers.  The officers agreed to confront Demoree in the marina parking lot.

234.    When Demoree arrived at the marina, James Fondo, Steven and Jessica Cady, Dr. Bober, and the BSO officers confronted her.



235.    While leaning against a police car, Steven Cady and Dr. Bober told Demoree the police were present to make sure she did not leave.

236.    Steven Cady and Dr. Bober told Demoree that they "just want to evaluate her."

237.     Demoree told Dr. Bober that she had been seeing Dr. Berrio for grief counseling, as stated above, who would confirm that she was "totally fine."

238.     Demoree asked Dr. Bober and Steven Cady whether she was being detained.  Dr. Bober responded, "For now you're being detained, yes."

239.     The Sig 9 private investigators told Demoree they were part of a "mobile crisis unit" from Memorial Hospital that worked with Dr. Bober.

240.     Demoree repeatedly told the police that she never met Dr. Bober[11] before, that he was not her doctor, and that her mother conspired with Dr. Bober to falsely Baker Act her.

241.     Demoree asked the officers to speak to Dr. Berrio, but they refused.

242.     The officers directed Demoree to Dr. Bober.

243.     Demoree tried to rationalize with the officers, stating, "he's not my doctor and you guys (the officers) said that you are going to detain me."

244.     By that time, Demoree had Dr. Berrio on the phone.

245.     The officer directed Demoree to have Dr. Berrio speak with Dr. Bober.

246.     Dr. Bober asked, "What is the doctors name?" – showing that he had never spoken to Dr. Berrio beforehand and knew nothing about Demoree's mental health status.

247.     It is important to pause and note that, although the intake report lists Desiree as the primary source to initiate the Baker Act, Demoree had not spoken to Desiree, or any other family member supposedly interviewed by Dr. Bober, since at least December 2023, after Desiree had Javon falsely arrested at Pinto Farms.[12]

---

[11] Accordingly, Dr. Bober had no right to initiate an involuntary examine under Florida's Baker Act.

[12] Therefore, any information Desiree and other family members supposedly provided to Dr. Bober was stale, in addition to being false.  Dr. Bober undoubtedly knew that the Baker Act statute requires a person to be an immediate threat to themselves or others based on *recent* behavior.  So

248.    To be clear, and as shown on the BWC footage, Demoree did not exhibit any characteristics to justify an involuntary civil commitment under Florida's Baker Act statute.

249.    She did not show any signs of psychosis, she did not threaten to harm herself, and she did not threaten to harm anyone else.

250.    Simply put, no objective fact existed to Baker Act Demoree.

251.    Demoree repeatedly asked to leave, but officers Denis and Reyes told Demoree that she could not because she was being Baker Acted.

252.    While Officers Reyes and Denis were speaking with Sig 9 investigators, Fondo and Steven Cady continued to fraternize with BSO.

253.    Cady stated, "Let the chief know would you."

254.    Demoree asked the officers to call their lieutenant.  The officers refused and stated, "That's not how that works."

255.    Demoree repeatedly stated that Dr. Bober is not her doctor, and that she has never spoken to him.

256.    Both officers stated, "It doesn't matter, he's a doctor."

257.    Demoree stated, "he's being paid by my mother… I don't even speak to her."

258.    Dr. Bober was standing right next to Demoree when she said, "I don't even speak to her."  Accordingly, Dr. Bober either knew, or should have known, that Desiree's information was stale – in addition to being false.

259.    Demoree then walked away and spoke with Dr. Berrio on the phone.

---

even if Desiree told Dr. Bober that Demoree threatened to harm herself (which is false), he knew that he was unable to rely on that information because it was stale.  At best, Dr. Bober purposefully ignored the staleness of Desiree's statements about Demoree; at worst, he knew Desiree made up the statements to falsely institutionalize Demoree.

260.    While Demoree spoke to Dr. Berrio, Steven Cady coached the officers into forcing Demoree to be transported by Sig 9.

261.    Officer Denis stated, "We're going to transport … because I doubt she's going to go with y'all."

262.    Steven Cady said, "You'd be surprised."

263.    Steven Cady then essentially coached the officers to threaten Demoree with being handcuffed in the back of the police car with the possibility of going to a "shithole facility" and be separated from her dog.

264.    Steven Cady did so in order to guarantee the facility of his choice, *i.e.* Memorial Hospital – a psychiatric unit run by Dr. Bober.

265.    In other words, Sig 9 needed to guarantee that Dr. Bober would appear as the initiating physician, so that he could control Demoree and appease Desiree.

266.    Not surprisingly, the officer later told Demoree that if she did not go with Sig 9, then they (the officers) would transport her in handcuffs, and her dog would be placed in a shelter.

267.    Members of Sig 9 even requested for the officers to "get [Demoree] off the phone" in order to preclude her from speaking with anyone who would intervene.

268.    Desiree, Dr. Bober, Sig 9, and the BSO sergeant all agreed to accomplish a common goal, *i.e.* commit Demoree to a mental health institution.[13]

---

[13] Desiree did not simply "elicit help from state authorities," as she claimed in her dismissal motion.  [D.E. 34, pg. 9].  She did not call 911 and ask for random officers to respond to her daughter going through a mental health crisis.  If that were the case, why didn't Desiree call 911 while Demoree was in Miami?  (Demoree was living in Homestead at the time).  Why did Desiree allow a person experiencing a mental health crisis to drive an hour away from her home?  Fondo even said on camera, "You would not want a mentally ill person driving around."  Obviously, Desiree needed to lure Demoree to Broward to meet Dr. Bober, the Sig 9 investigators, and the BSO officers who were sent out by their sergeant.  This was much more than a simply call for help.

269.     The officers then forced Demoree, a 29-year-old woman, to go with three complete

strangers in a dark gray truck with no hospital, police, or mental health facility insignia on it.



270.     Jessica Cady escorted/forced Demoree into the truck.

271.     The BSO officers never even verified the identity of any of the individuals on

scene to confirm that they belonged to a "mobile crisis unit."

272.     They never contacted dispatch or the hospital to confirm the existence of a

"mobile crisis unit" – which, not surprisingly, does not exist.

273.     Officer Denis even asked Steven Cady, "What is the mobile crisis unit?"  I never

heard of you guys.

274.     Steven Cady stated, "The chief knows what's going on.  The Sheriff knows what's

going on."

275.     Unfortunately, the officers just took the word of three fraudsters in a grey pick-up

truck and a rogue doctor retained by Desiree.

276.     Jessica Cady told to the officers that Demoree was "under control" of her Javon and

claimed to have videos and additional information about Javon and Demoree.

---

Desiree clearly conspired with state officials, *i.e.* Dr. Bober and the BSO sergeant and officers, to
achieve an unconstitutionally result, *i.e.* Baker Acting a person who does not qualify.

277.    Desiree clearly provided Sig 9 members with that narrative and conspired with Sig 9 and Dr. Bober to Baker Act Demoree.

278.    Frankly, the BWC footage is disgusting and difficult to watch.

279.    Equally disturbing, Dr. Bober wrote on the intake form that he "**personally examined**" Demoree on March 27, 2024, at 5:56 p.m.



280.    But his statement is bogus because, at 5:56 p.m., BWC footage shows Dr. Bober leaning against a truck parked in the maria and talking to the police.

44



281.    It is doubtful that any doctor has ever conducted a legitimate psychological evaluation under such circumstances.

282.    The video shows that Dr. Bober hardly talked to Demoree and did not ask a single question related to her mental health.

283.    On the BWC footage, Dr. Bober admitted that he had not conducted an evaluation.

284.    Nevertheless, Dr. Bober institutionalized Demore under the Baker Act - without any prior evaluation or explanation whatsoever.

285.    Demoree called out Dr. Bober in front of the police and asked for another doctor to do the evaluation because he was being retained by Desiree.

286.    Dr. Bober stated, "Any doctor you go to you are going to have to pay money to."

287.    Demoree stated, "I'd rather pay."

288.    Dr. Bober stated, "If you go to a OBGYN … you have to pay.  No doctor is going to see you for free."

289.    Based on Dr. Bober's statement, Desiree obviously paid him.

290.     Demoree stated, "I'd rather pay.  I don't like the conflict of interest.  Can I request another doctor."

291.     Doctor Bober stated, "You can request another doctor to do a *second* evaluation."

292.     Dr. Bober was dead set on performing the evaluation at Desiree's request.  Dr. Bober's license to practice medicine should be terminated.

293.     Demoree asked to drive herself to the hospital.

294.     The officer refused to allow her to do so and forced her to go with Sig 9.

295.     When Demoree arrived at Memorial Hospital on March 27, 2024, the first doctor examined her noted that she was alert, oriented to person, place and time, and that her behavior was normal.

ED Provider Notes - All Notes (continued)
ED Provider Notes by Danielle Cohen, MD at 3/27/2024  8:21 PM (continued)

General: No deformity.
Skin:
  Coloration: Skin is not jaundiced.
Neurological:
  General: No focal deficit present.
  Mental Status: She is alert and oriented to person, place, and time.
  Gait: Gait normal.
Psychiatric:
  Behavior: Behavior normal.
  Comments: **Calm, reasonable, good insight, not currently responding to internal stimuli**

296.     Nurses also noted that Demoree was "cooperative" and accused Dr. Bober of colluding with her mother, which is consistent with the BWC footage in this case:

Pt received AAOx4, is BA brought in by Dr Bober. Pt states "my mom knows Dr Bober and wanted me BA because she does not like my boyfriend. I was tricked into coming here. I was led to believe I was meeting someone at the house for business and PD were waiting for me." Pt denies any SI/HI, pt is calm and cooperative.

29 yr old female presents as Baker Act initiated by Dr Bober for "unspecified psychosis." Patient is awake, alert and oriented to person, place and time. Affect appropriate. Denies SI/HI. No previous psych history noted/ No suicide attempts/ on no medications at this time. Denies medical problems. No drug history noted. Denies ETOH use/ non- smoker. Patient states that mother is against her because she is upset about her 15 yr relationship with a "black" young man.
Patient works as a Social Worker for immigrations. She has a Bachelors degree in Sociology, graduated from Boston University.
This writer spoke with Javon Hadley 786-514-1867, patients boyfriend, consent given from patient to speak with him. He states that patient has no prior psych history and was "set up" by her mother.
Will transfer patient to PEAC for further monitoring and disposition.

297.    Reading "between the lines," the hospital staff was clearly concerned about Dr. Bober's decision to detain Demoree for an involuntarily examination and documented her side of the story.

298.    Nevertheless, Dr. Bober falsely reported that Demoree required "intensive, comprehensive, multimodal treatment including 24-hour medical supervision," which is something that none of his colleagues at the hospital noted.

299.    Dr. Bober even directed staff to medicate Demoree with Benadryl, haloperidol, and lorazepam – the latter two being psychotropic drugs.

diphenhydrAMINE (BENADRYL) 50 mg, haloperidoL (HalDOL) 5 mg, LORazepam (ATIVAN) 2 mg oral   [566793333]

| Ordered Dose: --<br>Scheduled Start Date/Time: 03/27/24 2143 | Route: **Oral**<br>End Date/Time  03/29/24 1132 | Frequency: **EVERY 6 HOURS PRN** for Agitation |
|---|---|---|

Admin Instructions:
If patient refuses PO give IM.

| Order Status: **Discontinued**<br>Ordering User: Roberto C Porras, RN<br>Ordering Provider: Daniel Ivan Bober, DO<br>D/C User: Discontinue, Orders Automatic<br>D/C Reason: Patient Discharge | Ordering Date/Time: Wed Mar 27, 2024 2144<br>Authorizing Provider: Daniel Ivan Bober, DO<br>D/C Date/Time: Fri Mar 29, 2024 1132<br>D/C Verified By: Not Verified |
|---|---|

**Components**

| Component | Order Dose | Admin Dose |
|---|---|---|
| diphenhydrAMINE 25 mg Cap | 50 mg | 50 mg |
| haloperidoL 5 mg Tab | 5 mg | 5 mg |
| LORazepam 2 mg Tab | 2 mg | 2 mg |

Component Details

Linked Group: See Hyperspace for full Linked Orders Report.
Order part of panel: BENADRYL ,HalDOL ,ATIVAN Sedation Panel

300.    In the screenshot above, Dr. Bober wrote, "If patient refuses PO give IM" – which essentially means that if Demoree refused the psychotropic medication, then Dr. Bober ordered the nurses to force it upon her through an intermuscular injection.

301.    Dr. Bober wrote false information in his report to keep Demoree detained and Desiree happy.  Dr. Bober even admitted speaking to Desiree on the BWC footage.

302.    Important to the issues below, Memorial Regional tested Demoree for drugs on March 27, 2024, which came back negative:



***Desiree's Frivolous Marchman Act & Guardianship Petitions***

303.    Regardless of the negative drug test at Memorial Regional, Dr. Bober conspired with Desiree to committed Demoree to Life Skills South Florida Outpatient, LLC ("Life Skills"), which is a drug treatment facility where *he is the medical director*.   Life Skills is owned by or affiliated with Odyssey Behavioral Healthcare.



304.    On March 29, 2024, despite Demoree's normal behavior and negative drug test, Desiree filed an emergency *ex parte* petition under Florida's Marchman Act, claiming that Demoree suffered from drug and alcohol abuse – something that both she and Dr. Bober knew was untrue.  Demoree has never done drugs in her life.



305.    Desiree specifically requested for Demoree to be transferred from Memorial Hospital to Life Skills so that she and *Dr. Bober* could continue Demoree's unlawful detention.

49

> affecting Respondent's daily functioning, safety judgment as she refuses treatment. The
> Petitioners are requesting this Honorable Court enter an Emergency Ex Parte Order for
> Involuntary Assessment and Stabilization and have the Sheriff or any law enforcement pick-up
> the Respondent UPON HER DISCHARGE AT MEMORIAL HOSPITAL and **transport her**
> **to LIFESKILLS SOUTH FLORIDA located at 1431 SW 9th Avenue, Deerfield Beach, FL**
> **33441** for assessment, and further stabilization. The Respondent has medical insurance and/or

306.    Perhaps most disturbing, Desiree also moved for guardianship over Demoree on
March 29, 2024, claiming that her 30-year-old, highly educated daughter, who never touched an
illegal drug in her life, was "incapacitated."

---

IN THE CIRCUIT COURT IN AND FOR BROWARD
COUNTY, FLORIDA          PROBATE DIVISION

IN RE:
                         File No. _____
DEMOREE LOPEZ
                         Division: _____
An alleged incapacitated person.

**PETITION TO DETERMINE INCAPACITY**

Petitioner, Desiree Perez, together with the undersigned counsel hereby file this
Petition to Determine Incapacity and in support thereof state as follows:

1.    Petitioner is an adult, whose present address is 6265 SW 110th Street, Miami,
FL 33156, and whose relationship to the hereinafter named alleged incapacitated person
is mother.

2.    Petitioner believes Demoree Lopez (hereinafter referred to as the "AIP"),
age 29, a resident of Miami-Dade County, Florida, whose primary spoken language is
English, whose residential address is 19433 SW 144th Court, Miami, FL 33157, and whose
present location is Memorial Regional Hospital, 3501 Johnson St., Hollywood, FL 33021,
to be incapacitated, based upon the following factual information:

---

307.    Desiree blatantly lied in her guardianship petition, claiming that Demoree was
"asking friends and family to share prescription pain pills."

> Recently, the AIP has been asking friends and family to share prescription pain pills with her, including Milleidys Garcia, Minerva Alvarez (her grandmother), and Liz Fragela. Petitioner is also aware that the AIP has gone to urgent care on multiple occasions, and Petitioner suspects she is doing this only to obtain prescription pain medication. She has been going to multiple pharmacies a day in order to fill and pick up prescriptions for pain medications. Petitioner contends she is taking these pain pills to self-medicate and escape this abusive relationship.
>
> Petitioner spoke to the AIP and expressed her concern about the prescribed medication she was using because she could become addicted. The AIP explained that she crushed the pills *"so they could be more effective"* and said she received a prescription codeine, but it wasn't working as it wasn't *"strong enough."*

308.    Desiree listed Liz Fragela as one of the people Demoree supposedly asked for pills – the same Liz who Desiree used during the second fraudulent Baker Act attempt and who was financially indebted to Desiree for saving her company.

309.    Demoree has all her text message conversations with Liz.  The message show that Demoree never asked Liz for illegal drugs or pills.

310.    Desiree also listed "Milleidys Garcia" as a person Demoree sought out for drugs. But when Millie was placed under oath by the State Attorney's Office, she admitted that Demoree does not do drugs or drink.

> itself, and reported the Victim was getting kidnapped. The Victim's Mother also petitioned to have the Victim Marchman acted and the Victim was Baker Acted. The Witnesses, under oath, told ASA Sopena and ASA Farrell that the Victim does not do drugs or drink (*See Witnesses*

311.    Millie was the caretaker for Demoree's grandfather and was frequently in Demoree's presence.

312.    Minerva also never accused Demoree of using drugs.

313.    Moreover, Desiree filed the petition on March 29, 2024, but Demoree stopped communicating with her mom long beforehand.  Desiree made blatant misrepresentations to a court, again.

***Demoree is Transferred to Life Skills***

314.     Since Desiree concocted a fraudulent *ex parte* Marchman Act petition, Demoree was transported to Life Skills on March 30, 2024.

315.     While at Life Skills, Demoree repeatedly asked to be examined by someone other than Dr. Bober, but they initially refused.

316.     But unbiased professionals began to realize Demoree did not belong there.

317.     The staff wrote that Demoree was, "not delusional, speech is normal, no hallucinations, thought process intact."  They also noted Demoree was always "positive."

318.     Nevertheless, Life Skills required Demoree to undergo treatment for an addiction she did not have.

319.     Demoree begged to take a hair follicle test.  Eventually, a worker at Life Skills acquiesced on April 3, 2024.

320.     Not surprisingly, Demoree's hair follicle test, which detects drug use 90 days prior (at a minimum), showed no drugs had been in Demoree's system.



321.    Life Skills still did allow her to leave after two negative drug tests.

***Javon's Second Fraudulent Arrest***

322.    On April 5, 2024, while Demoree was at Life Skills, Desiree conspired with others and government officials to get Javon arrested for an alleged battery that occurred on September 11, 2023.

323.    This was another ploy by Desiree and her co-conspirators because, in a meeting in January 2024, just months earlier, the State told Desiree and her team that no probable cause existed to arrest Javon for the September 11, 2023, alleged incident.

| | |
|---|---|
| From: | Lindsay Davis |
| Sent: | Wednesday, January 31, 2024 5:30 PM |
| To: | Brett Schwartz |
| Cc: | Nicolas Chavez; U307113@mdpd.com; Desiree Perez; Daniel Mosquera; Thuy Le |
| Subject: | RE: Demoree Perez v Javon Hadley |

Good Evening,

As discussed on the phone on Monday, I have reviewed all of the evidence from the google drive provided in relation to the September 11th incident, including all of the audio recordings, and transcripts of said recordings. My Assistant Chief who speaks Spanish assisted me in calling Ms. Olga Zayas and Ms. Miladys Garcia to obtain their statement regarding September 11th. I also spoke with Detective Williams, who had already reviewed and investigated the September 11th incident on her own and obtained statements from Ms. Zayas and Ms. Garcia. I also obtained and reviewed the body worn camera footage from the patrol officers who responded to the home on September 11th.

After my thorough review, unfortunately there is not enough evidence without a cooperating victim to establish probable cause for a crime. I took into consideration and thoroughly thought through a potential battery, assault, or false imprisonment. I have also reviewed the affidavit provided last night but it does not change the ultimate conclusion, that without the victim's cooperation and testimony we cannot meet the elements required by law for any of the three crimes mentioned.

I deeply sympathize with the situation and understand the pressing safety concern for Demoree. And if we obtain any additional evidence surrounding any other domestic violence incidents, I will of course thoroughly review or try to assist in any way I can.

Sincerely,

LINDSAY DAVIS
*Assistant State Attorney*
Division Chief, Misd. Domestic Violence Unit
Miami-Dade State Attorney's Office
------------------------------------
175 NW 1st Ave, Suite 2500
Miami, FL 33128
305.349.5793

324.    But as reflected in the State's Closeout Memo, Desiree essentially hired a team to get what she wanted.

At some point during March 2024, the Victim's Mother hired Lara Gatz and former Chief of the Miami Dade State Attorney's Office Narcotics Division Jessica Caso-Pedraja. After this, in late March, the Victims Mother went back to the MDPD with the google drive of evidence previously reviewed and MDPD re initiated an investigation into the September 11th incident. The only "new evidence" between January 2024 when the SAO and MDPD found no probable cause and April 5th when the Defendant was arrested were the formal recorded interviews of the Witnesses. However, those Witnesses had submitted Affidavits and previously spoken with the State to provide their testimony related to the incident. The recorded interviews did not change the fact that the Witnesses never saw the battery and provided the same information to the State and MDPD previously.

When the April arrest was effectuated, Ms. Caso-Pedreja told ASA Farrell that she was the former Chief of the Narcotics Unit and was very well connected with the police departments. She also told ASA Farrell to not be surprised if the case is taken from her and given to a more "experienced ASA."

During Detective Menoud's profile (the arresting Detective on M24007363), her Sergeant, Sergeant Reyes, requested to be present during the Detective's profile, which is unusual. Detective Menoud did not speak to the Victim; Detective Menoud did not speak to the Witness (Detective Palmer did).

325.    Despite the frivolity of his arrest, as recognized by the State, Javon was initially ordered to stay away from Demoree.

326.    Desiree capitalized on Javon's wrongful arrest and was not finished terrorizing the Hadleys.

### Javon's Third Fraudulent Arrest

327.    On April 8, 2024, as Demoree was about to be released from Life Skills, Desiree conspired with others to get Javon false arrested, again, for allegedly violating the stay away order related to the April 5, 2024, fraudulent arrest for the "battery" on September 11, 2023 – the same one the State previously found no probable cause to arrest.

328.    Desiree pretends that she was not involved in Javon's fraudulent detention on April 8, 2024, but she had her hands all over it, according to the emails related to this case.

> **From:** Desiree Perez <dperez@scarterenterprises.com>
> **Date:** April 8, 2024 at 12:34:36 PM EDT
> **To:** "Gatz, Lara T." <LGatz@reedsmith.com>, Jessica Caso <jessica@casopedrajalaw.com>
> **Subject: HERE ARE VIDEOS AND PICS FOR BOTH VIOLATIONS**
>
> https://drive.google.com/drive/folders/1flLRuRrKL1-IVJud4Nc_OH4WpU-2cnWM?usp=drive_link
>
> --
> DESIREE PEREZ
> Chief Executive Officer
>
> ROCNATION

329.    Javon's April 8, 2024, arrest was another bogus event captured on body worn cameras.

330.    That day, Javon responded to his home to feed the cat.

331.    Demoree was still in custody under the fraudulent Marchman Act petition, but was set to be released later that day.

332.    Desiree's private investigators, who were monitoring Javon, contacted the police and told them that Javon was at the house.

333.    The BWC footage captures officers speaking with their supervisor about this case. The officers admitted the "higher-ups" directed them to arrest Javon.  This nefarious act was also addressed in the State's Closeout Memo.

> This arrest was prompted by a Private Investigator, hired to follow the Defendant. The Private Investigator contacted an MDPD Sergeant to report the Defendant at the residence, which was under surveillance. This violation is not based on any contact with the Victim and was quite frankly discovered through questionable means.
>
> When the arresting officers arrived on scene, they had no idea why they were there. They responded to a "domestic violence violation" but were directed to go to the address by the Sergeant. A Private Investigator then approached one of the officers to provide them with a copy of the Stay Away Order.
>
> The responding offices had to call the Sergeant to figure out what was going on and why they were there. In trial, the cross of these officers would be detrimental to the State's case. The

334.    After Desiree caused the police to wrongfully arrest Javon a third time, Demoree was released from Life Skills.

### *Desiree's Attempt to Manipulate the Court System*

335.    Desiree used high-priced lawyers to influence Javon's prosecution and manipulate the court system.

336.    Specifically, Desiree paid three of the top law firms in the country to represent "witnesses" in a misdemeanor battery case, *i.e.* Reed Smith, Holland and Knight, and Quinn Emmanuel.[14]

---

[14] Fortunately, the prosecutor here had a strong backbone and were supported by an experienced and long-standing State Attorney, Katherine Fernandez Rundle – unlike other prosecutors out West, who were influenced by Desiree.

337.     The "witnesses" attorneys attacked defense counsel for standing up against them and doing his job.



**Reed**Smith LLP

Driving progress
through partnership
**Lara T. Gatz**
Direct Phone:  +1 305 619 3738
Email:  lgatz@reedsmith.com

Reed Smith LLP
200 S Biscayne Blvd
Suite 2600
Miami, Florida 33131
+1 786 747 0200
Fax +1 786 747 0299
reedsmith.com

*Admitted in NY and PA; pending admission in FL.

April 22, 2024

**VIA EMAIL**

ASA Joshua A. Amador (Joshuaamador@MiamiSAO.com)
ASA Josephine Farrell (JosephineFarrell@MiamiSAO.com)
Office of the State Attorney Katherine Fernandez Rundle
175 N.W. 1st Avenue, Suite 2500
Miami, Florida 33128

Re:     State of Florida v. Javon Hadley
            M-24-007363 and M-24-007551

Dear ASAs Amador and Farrell:

        We write to alert you to apparently unethical, and indeed potentially criminal misconduct engaged in by Nayib Hassan, Esq. ("Hassan"), in his capacity as legal counsel for Defendant Javon Hadley ("Defendant" or "Hadley") as it relates to the victim/witness in the case, Demoree Lopez ("Lopez").  We request that you immediately alert Judge Alicia Garcia Priovolos ("Judge Priovolos"), so that the Court may take whatever action it deems appropriate to address this situation and restore fairness and integrity to this process.

338.     In addition to writing countless emails to the judge and state, Desiree even directed the high-priced lawyers paid by her to confront Demoree.

339.     On April 26, 2024, the State asked Demoree to give a sworn statement in their office.

340.     When Demoree arrived, the receptionist instructed her to sit in the waiting room.

341.     While waiting for the prosecutor, Demoree saw Lara Gatz, Esq., an attorney from Reed Smith, who supposedly represented the "witness" in Javon's case.

342.     Lara Gatz walked in and spoke with the receptionist and asked, "Has Demoree Lopez arrived yet?  She is supposed to be meeting with the ASA at 9:00 a.m."

343.     Lara Gatz did not see Demoree.

344.    The receptionist asked Lara Gatz who she was.

345.    Lara Gatz identified herself as "Demoree's attorney and the witnesses."

346.    The receptionist told Lara Gatz that Demoree was inside the waiting room and asked her if she wanted to sit with "her client."

347.    Lara Gatz, knowing that she did not represent Demoree, said that she would just wait outside.

348.    Demoree believes that her mother instructed Lara Gatz to respond to the prosecutor's office to intimidate Demoree.

349.    This was the second time that attorneys hired by Desiree falsely claimed they represented Demoree.

350.    Stooping to a new level, Desiree even had TMZ ask if Javon would be prosecuted.

**From:** Delgado, Jennifer <Jennifer.Delgado@tmz.com>
**Sent:** Friday, April 26, 2024 10:38 AM
**To:** Josephine Farrell <JosephineFarrell@MiamiSAO.com>; olreyes@mdpd.com
**Subject:** TMZ inquiry re: Javon Hadley case

**CAUTION:** This email originated from outside the **Miami-Dade State Attorney's Office** organization. **Be Suspicious of Attachments, Links, and Requests for Login information.** Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Ms. Farrell and Mr. Reyes,

I'm one of the court producers at TMZ. I'm looking into the Javon Hadley case and understand that there is a jail call that violates the stay away order, as he is sending messages to the victim (Demoree Lopez) while incarcerated for a violation of the same order.

Most notably, the defendant is heard on the audio, saying that he has "*connections with judges*" in the Miami area and insinuates that he will "*get off easy.*"

Can you please advise on whether you are planning to arrest Mr. Hadley on the newly-discovered violations? Additionally, please place me on any lists you may have for future press releases regarding the case.

Thank you for your prompt attention to this matter.

Best,
Jennifer Delgado
Senior News Producer
██████████

351.    Lawyers from Quinn Emanuel in New York then jumped in to influence the prosecution.  As shown in the email below, Alex Spiro, Esq. contacted the State and wrote a memorandum trying to influence the prosecution of a misdemeanor case.

**From:** Joanna Menillo <joannamenillo@quinnemanuel.com>
**Sent:** Tuesday, April 30, 2024 6:36:41 PM
**To:** Nicolas Chavez <NicolasChavez@MiamiSAO.com>; Alex Spiro <alexspiro@quinnemanuel.com>; Gatz, Lara T. <LGatz@reedsmith.com>
**Cc:** A-Team <a-team@quinnemanuel.com>
**Subject:** RE: Hadley

Nick, further to your conversation with Alex last week, attached please find a memorandum regarding this matter.

Thank you,

**Joanna Menillo**
*Associate*
Quinn Emanuel Urquhart & Sullivan, LLP

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7050 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
joannamenillo@quinnemanuel.com
www.quinnemanuel.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP

**MEMORANDUM**

<u>CONFIDENTIAL</u>

**TO:**       Assistant State Attorney Nicolas Chavez
            Miami Dade State Attorney's Office
            1350 NW 12th Ave.
            Miami, FL 33136-2102

**FROM:**     Alex B. Spiro

**DATE:**     April 30, 2024

**RE:**       Investigation of Javon Hadley

---

Following our telephone conversation last week, we undertook a detailed analysis of the relevant authority concerning the quantum of evidence necessary to establish threats criminalized by Florida Statue § 836.10. To the extent it will aid in your charging decision in the Javon Hadley investigation, we provide the below memorandum detailing our view that there is sufficient evidence to sustain a charge against Mr. Hadley under Section 836.10. We are happy to discuss at your convenience.

352.    Obviously, the State did not appreciate the manner in which Desiree interfered with their case, or the timing of Demoree's frivolous detention under Florida's Baker Act and Marchman Act statutes.

| From: | Joshua A Amador |
|---|---|
| Sent: | Thursday, May 2, 2024 3:08 PM |
| To: | Johnette Hardiman; Nilo Cuervo |
| Cc: | Nicolas Chavez; Josephine Farrell; Gleisy Sopena |
| Subject: | FW: Def: Javon Hadley |
| Attachments: | Letter From -.pdf |

Good afternoon everyone,

This is the case we have spoken about in the past, regarding the new arrest on an old finding of no-PC with a new detective, timed with the apprehension of the victim under Baker/Marchman, and with all the various forces and interests insisting the State Attorney's Office take actions not in line with our policies, the evidence, or good-faith practices. These efforts continue to be resisted as we near the good-faith conclusion of our investigation.

I have attached a letter that the victim's aunt (unofficial mother) had forwarded to Judge Garcia Priovolos, both to report on our perceived inaction and to urge the court to *sua sponte* revoke the Defendant's bond.

Below is the e-mail from Lieutenant Sanchez who has entered the fray after we rebuffed the efforts of the Sergeant and lead Detective in "suggesting," when not interfering, with either our investigation and/or filing decisions, now again pursuing the same.

The letter below and attached both refer to contents of the jail calls. **Notably, it is unclear who suggested the contents of these jail calls to either TMZ or to the private attorneys of the victim's mother/aunt/employees.** Insofar as I am aware, no one in this Unit has provided these sensitive materials upon the requests of both the police and lawyers. Gatz did attempt to send me an e-mail thanking me for giving her this information, except I did no such thing and immediately replied to her, rebuffing this suggestion.

This case continues to be monitored by the chiefs here in Misdemeanor DV and will not be taken off its due course, but I thought it prudent to update everyone.

Sincerely,

**Joshua Alexander Amador**
**Assistant State Attorney**
**Chief of the Misdemeanor Domestic Violence Unit**
**Office of the State Attorney Katherine Fernandez Rundle**
175 N.W. 1st Avenue, Suite 2500
Miami, Florida 33128
Direct Line: (305) 349-5793

353.    Nevertheless, the onslaught of emails and communications trying to influence the prosecution did not stop.



**Driving progress**
through partnership

**Lara Treinis Gatz, Esq.***
**Partner, Global Regulatory Enforcement**
Direct Phone: +1 305 619 3738
Email: lgatz@reedsmith.com

Reed Smith LLP
200 S Biscayne Blvd
Suite 2600
Miami, Florida 33131
+1 786 747 0200
Fax +1 786 747 0299
reedsmith.com

May 3, 2024

VIA EMAIL
ASA Joshua A. Amador
Office of the State Attorney Katherine Fernandez Rundle
175 N.W. 1st Avenue, Suite 2500
Miami, Florida 33128

Re:   State of Florida v. Javon Hadley
        M24-7363 and M24-7551

Dear ASA Amador:

As you know, I represent Olga Zayas and Milleidys Garcia (the "Witnesses"), in connection with the above-referenced prosecution. Earlier today, I was made aware of multiple statements made by you in an email dated May 2, 2024, which are untrue and must be addressed.

Further, in your May 2, 2024 email you state "[i]nsofar as the answers being sought by the family; they have them, and have had them for weeks; months, in some ways and through prior counsel." This is also untrue. We have many questions about Javon Hadley's multiple violations of the stay away orders and your failure to take action in that regard. We are well-aware that you are in possession of evidence proving multiple violations of the stay away orders and are baffled at your office's refusal to either advise the Court of the violations or take any action yourselves. Instead, you appear to be doing little but blocking the MDPD from doing their job enforcing the law. In short, we have no answers.

354.    Day-in and day-out, lawyers for the "witnesses" continued to email the State to influence the prosecution of Javon.



Driving progress
through partnership

**Lara Treinis Gatz, Esq.***
**Partner, Global Regulatory Enforcement**
Direct Phone: +1 305 619 3738
Email: lgatz@reedsmith.com

Reed Smith LLP
200 S Biscayne Blvd
Suite 2600
Miami, Florida 33131
+1 786 747 0200
Fax +1 786 747 0299
reedsmith.com

May 6, 2024

VIA EMAIL
ASA Joshua A. Amador
ASA Josephine Farrell
Office of the State Attorney Katherine Fernandez Rundle
175 N.W. 1st Avenue, Suite 2500
Miami, Florida 33128

      Re:    State of Florida v. Javon Hadley
             M24-7363 and M24-7551

Dear ASAs Amador and Farrell:

    As you know, I represent Olga Zayas and Milleidys Garcia in connection with the above-referenced prosecution. I write to provide you with evidence proving that, prior to September 11, 2023, the Defendant Javon Hadley and the victim Demoree Lopez were fully aware of the presence of the Audio/Video Recording System installed at 19433 SW 114 Court Miami Florida 33157 (the "Residence"), which is the location the September 11, 2023 assault and battery perpetrated by the Defendant against Demoree Lopez.

    355.    For some reason, the lawyers for the "witnesses" even tried advocating positions to the judge, which the State did not support.



**Driving progress**
*through partnership*
**Lara T. Gatz**
Email: lgatz@reedsmith.com

\*Admitted in NY and PA; pending admission in FL.

May 8, 2024

The Honorable Alicia Garcia Priovolos
Eleventh Judicial Circuit
Domestic Violence Division
Lawson E. Thomas Courthouse
175 N.W. 1st Ave.
Miami, FL 33128

     Re: <u>State of Florida v. Javon Hadley</u>
        M-24-007363 and M-24-007551

Dear Judge Priovolos:

We write to respectfully request that the Court consider reviewing the
Defendant's jail calls, not as an advocate for any party, but in your role as the
ultimate authority in this matter exercising your inherent power to ensure that
the two stay away orders issued by the Court in the above-referenced matters
are being complied with.

356. When the state-court judge shot down the "witnesses" attorney's request, they
began feverishly contacting the State again.

64

**MEMORANDUM**

<u>CONFIDENTIAL</u>

| | |
|---|---|
| **TO:** | Assistant State Attorney Joshua A. Amador |
| | Assistant State Attorney Josephine Farrell |
| | 175 N.W. 1st Avenue, Suite 2500 |
| | Miami, Florida 33128 |
| | |
| **FROM:** | Lara T. Gatz |
| | |
| **DATE:** | May 10, 2024 |
| | |
| **RE:** | State of Florida v. Javon Hadley |

Following our meeting Wednesday, we undertook a detailed analysis of the relevant authority concerning the sufficiency of the evidence to support the charges of assault and battery against Javon Hadley. Specifically, we analyzed whether circumstantial evidence is sufficient to prove the well-founded fear element of assault and the quantum of evidence needed to prove the unwanted touching element of battery.

**From:** Gatz, Lara T. <LGatz@reedsmith.com>
**Sent:** Monday, May 13, 2024 5:02 PM
**To:** palopez@jud11.flcourts.org
**Cc:** Jessica Caso-Pedraja <jpedraja@me.com>; Joshua A Amador <JoshuaAAmador@MiamiSAO.com>; Josephine Farrell <JosephineFarrell@MiamiSAO.com>; hassan@nhassanlaw.com; Gleisy Sopena <GleisySopena@MiamiSAO.com>; Nite, Linda <LNite@reedsmith.com>
**Subject:** RE: State of Florida vs JAVON HADLEY; Case Nos. M-24-007363 and M-24-007551
**Importance:** High

**CAUTION:** This email originated from outside the **Miami-Dade State Attorney's Office** organization. **Be Suspicious of Attachments, Links, and Requests for Login information.** Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Lopez, as indicated in the letter, an emergency hearing is requested for tomorrow, Tuesday May 14, 2024.

Thank you.

| From: | Gatz, Lara T. |
|---|---|
| Sent: | Monday, May 13, 2024 1:59 PM |
| To: | Joshua A Amador; Gleisy Sopena; Josephine Farrell |
| Cc: | Jessica Caso-Pedraja |
| Subject: | Hadley matters |

**CAUTION:** This email originated from outside the **Miami-Dade State Attorney's Office** organization. **Be Suspicious of Attachments, Links, and Requests for Login information.** Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon, when we were in Court on Friday, ASA Sopena advised the Judge that she was in the process of comparing the evidence ASA Lindsay Davis reviewed in January 2024, with the new evidence presented to the MDPD in March and April 2024. Below is a list of some of the new information presented to the MDPD in March and April 2024, and how the meeting with the MDPD was arranged.

357.    Holland and Knight jumped in as well, contacting the State Attorney directly.

From: Wifredo.Ferrer@hklaw.com <Wifredo.Ferrer@hklaw.com>
Sent: Tuesday, May 14, 2024 7:35 AM
To: Nilo Cuervo <NiloCuervo@MiamiSAO.com>; Joshua A Amador
<JoshuaAAmador@MiamiSAO.com>; Josephine Farrell <JosephineFarrell@MiamiSAO.com>
Cc: Barbara.Martinez@hklaw.com; Katherine Fernandez Rundle
<KatherineFernandezRundle@MiamiSAO.com>; Wifredo.Ferrer@hklaw.com
Subject: Letter and Attachments re: Florida v. Hadley

**CAUTION:** This email originated from outside the **Miami-Dade State Attorney's Office** organization. **Be Suspicious of Attachments, Links, and Requests for Login information.** Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning, all.

It has come to our attention that the attached letter and links to jail calls below were provided to the Court yesterday afternoon by counsel for the witnesses. The letter explains that the jail calls reveal Hadley and his mother talking about attempts to influence the outcome of the case through corruption, violations of the stay away order, and talk of a scheme to extort our client. We are forwarding them to you for your information and consideration.

Please let us know if you have any questions. Again, we regret that our schedules do not permit for us to connect today.

Best,

Willy

358.     Despite hiring the best lawyer's money can buy, Desiree was unable to coerce the State to prosecute Javon.

359.     Eventually, the prosecutor dropped all charges against Javon, but memorialized Desiree and her team's inappropriate actions in a scathing 11-page close-out memorandum.

360.     Of course, Desiree would not allow the State's memorandum to standing without a threat.

ReedSmith
Driving progress
through partnership
Edward M. Mullins
Direct Phone: +1 786 747 0203
Email: emullins@reedsmith.com

Reed Smith LLP
200 S Biscayne Blvd
Suite 2600
Miami, Florida 33131
+1 786 747 0200
Fax +1 786 747 0299
reedsmith.com

October 3, 2024

**By Electronic Mail**
nilocuervo@miamisao.com

**Nilo A. Cuervo, Jr., Esq.**
**Deputy Chief Assistant States Attorney**
**Miami-Dade States Attorney's Office**
**1350 NW 12th Ave Rm 333-N**
**Miami, FL 33136-2102**

     Re:   **Proposed Corrections to the Closing Memorandum dated September 15, 2024**
           **Case No:  M24-7363 & M24-7551**

Dear Mr. Cuervo:

I write to offer proposed corrections to the Closing Memorandum ("Closing Memo" or "Memo") in the above-referenced matter dated September 15, 2024. These corrections are critical in order to correct the record in this matter, as the current version of the Memo contains inaccurate, false and libelous information.

361.     When their 10-page memo, full of corrections, went unanswered, Desiree's team wrote a follow-up email, threatening to take the next step.

**From:** Ocampo, Daniela <DOcampo@reedsmith.com>
**Sent:** Monday, October 21, 2024 1:00 PM
**To:** Nilo Cuervo <NiloCuervo@MiamiSAO.com>
**Cc:** Mullins, Edward M. (MIA) <EMullins@reedsmith.com>; Gatz, Lara T. <LGatz@reedsmith.com>; Josephine Farrell <JosephineFarrell@MiamiSAO.com>; Jose Arrojo <JoseArrojo@MiamiSAO.com>; Katherine Fernandez Rundle <KatherineFernandezRundle@MiamiSAO.com>; Stephen K. Talpins <StephenKTalpins@MiamiSAO.com>
**Subject:** RE: State v. Javon Hadley re: M24-7363 & M24-7551

You don't often get email from docampo@reedsmith.com.  Learn why this is important

> **CAUTION:** This email originated from outside the **Miami-Dade State Attorney's Office** organization. **Be Suspicious of Attachments, Links, and Requests for Login information.** Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon,

Following up on the below, and on behalf of Edward Mullins:

     Mr. Cuervo, I write to bring additional information to your attention in connection with the above referenced matter.
First, in connection with the ▋▋▋▋▋ assessment, Ms. Lopez-Hadley was interviewed and assessed by two clinicians: a primary therapist and a family therapist, both of whom offered diagnoses of Ms. Lopez.  Further, a treating physician concurred with the diagnoses.  Thus, the suggestion that Ms. Lopez-Hadley was "wrongfully" ▋▋▋▋▋ and ▋▋▋▋▋▋▋ is simply untrue as evidenced by the conclusion of three medical professionals.  Moreover, as I am sure you would agree, it is not for the State Attorney's office to comment on the propriety of the ▋▋▋▋▋ or ▋▋▋▋▋▋▋ matters particularly as they are totally unrelated to the closing of the criminal case.

Second, in defendant's confession to detectives, Mr. Hadley admitted that he was fully aware that there was a camera right outside of his bedroom. Indeed, he said "I know it was the camera outside the door, and it was like security cameras outside the back door, and in front of the house. I think we had like five cameras. I had access to the cameras. They gave me access. Her grandmother gave me access to the cameras. I used to check the house." In short, the defendant's own words are further proof that no "illegal recording" took place as suggested.
Finally, it has been almost three weeks since I sent the email seeking your position on proposed corrections to the closing memo.  I respectfully urge you to respond to my request by the end of the week as your office's position will dictate our next steps.  Your prompt attention to this matter is greatly appreciated.

Sincerely,

Ed Mullins.

**Daniela Ocampo | Executive Assistant**
*Global Commercial Disputes Group*
**ReedSmith** LLP
200 S. Biscayne Blvd
Suite 2600
Miami, FL 33131
T: +1 786 747 0200
D: +1 786 747 0314
F: +1 786 747 0299
docampo@reedsmith.com
www.reedsmith.com

362.     Eventually, Desiree had to accept the fact that her influence and team of lawyers could not improperly influence the Miami-Dade State Attorney's Office.

### *Desiree's Frivolous Lawsuits*

363.     In addition to her frivolous conducted above, on April 22, 2024, Desiree filed a frivolous lawsuit against Demoree.

364.     In that case, Demoree's mom and stepfather (Desiree's husband) surprised Demoree with a new car in December 2020, which they put in Demoree's name.

365.     Desiree claimed she was "the lawful owner of the car," which was false. Title to the car had always been in Demoree's name.

366.     Desiree claimed she has a "mutual agreement" where Demoree was "granted use of the vehicle with the understanding that it would not be disposed of without Desiree's permission." This too was false.

367.     Desiree claimed Demoree wrongly asserted control over the Vehicle, causing harm to Desiree.

368.     A brief reading of the lawsuit shows how low Desiree will stoop to get what she wants.[15]

369.     Recently, Desiree filed a separate lawsuit against Javon, claiming that he violated her right to privacy in a home that she does not live in and only entered three times in the last four years.

370.     In fact, Javon and Demoree actually lived in the house that Desiree somehow claimed a right to privacy in.

371.     That lawsuit is also frivolous and only intended to harass the Hadleys.

---

[15] Even an upset multimillionaire suing her own daughter over a car is rare.

372.     Demoree and Javon have spent a large amount of money on lawyers to escape her unlawful detentions and lost out on countless job opportunities.

## COUNT I: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) – DESIREE PEREZ

373.     Demoree re-alleges the allegation contained in paragraphs 1-372 of this Complaint.

374.     Demoree brings this action against Desiree Perez pursuant to title 18, U.S.C. section 1964, as Demoree was injured in her business or property.

375.     Desiree violated 18, U.S.C. section 1962.

376.     Desiree engaged in a pattern of racketeering activities. Specifically, Desiree unlawfully committed wire fraud, by using electronic communications to defraud, or executed a scheme to defraud, bribery, witness tampering, kidnapping and/or false imprisonment (forcing Demoree into a truck), and other criminal acts effecting interstate or foreign commerce.

377.     Desiree used wire communications in interstate or foreign commerce to execute or further the scheme.

378.     Desiree knowingly devised or participated in a scheme to defraud Demoree by using false or fraudulent pretenses, representations, or promises.

379.     The false pretenses, representations, or promises were about a material fact.

380.     Desiree acted with the intent to defraud.

381.     Desiree transmitted or caused to be transmitted by wire, radio or television some communication in interstate commerce to help carry out the scheme to defraud.

382.     Desiree had a plan or course of action intended to cheat Demoree out of job opportunities and cause her to be totally dependent on Desiree.

383.     Desiree offered, gave, or promised something of value to Dr. Bober, who worked at Memorial hospital as a public official.

384. Desiree did so with the intent to improperly influence Dr. Bober to perform or omit an act in violation of his duties, or to influence him to commit or allow fraud, *i.e.* Demoree's fraudulent Baker Act.

385. Desiree intentionally tampered with Demoree and Javon as witnesses to legal proceedings, attempting to influence, alter, or prevent the testimony of a witness in a legal proceeding, using methods like intimidation, threats, or coercion, and with knowledge the person is a witness or has relevant information.

386. Desiree caused Demoree to be detained under circumstances that were unreasonable and unwarranted.

387. Through the pattern of racketeering activities, Desiree acquired or maintained, directly or indirectly, an interest in or control of an association-in-fact enterprise, *i.e.* all the doctors, lawyers, tech gurus, police officers, and private investigators who she used to split up Demoree and Javon.

388. The enterprise engaged in, or had some effect on, interstate or foreign commerce.

389. Desiree paid several people in the organization to carry out these illicit actions against Demoree and Javon.

390. A direct causal relationship exists between Desiree's participation in the enterprise and Demoree's injuries.

391. Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, treble damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### COUNT II: CIVIL CONSPIRACY FLORIDA LAW
### DESIREE PEREZ, ROC NATION, NATALIE ANDERSON

392. Demoree re-alleges the allegation contained in paragraphs 1-372 of this Complaint.

393.    Demoree brings this action against Desiree Perez, ROC Nation, and Natalie Anderson for the state law tort of civil conspiracy.

394.    Desiree and Natalie Anderson, both employees of ROC Nation, entered into an agreement to achieve the common goal of trying to convince a health care provider to commit Demoree to a mental health facility under Florida's Baker Act statute, even though Demoree did not meet the criteria.

395.    Desiree and Natalie Anderson committed an unlawful act or used unlawful means to further their plan, *i.e.* they fraudulently acquired, modified, and presented a recording to get Dr. Berrio to falsely imprison Demoree under Florida's Baker Act statute.

396.    Desiree and/or Natalie Anderson took action to advance their plan when Desiree directed Natalie Anderson to confront Dr. Berrio in her office with a fraudulent recording of Javon supposedly raping Demoree.

397.    Alternatively, Desiree and Natalie Anderson, both employees of ROC Nation, entered into an agreement to achieve the common goal of trying to cause intentional infliction of emotion distress upon Demoree.

398.    Desiree and Natalie Anderson committed an unlawful act or used unlawful means to further their plan, *i.e.* they fraudulently acquired, modified, and presented a recording Dr. Berrio to intentionally cause emotion distress to Demoree.

399.    Desiree and/or Natalie Anderson took action to advance their plan when Desiree directed Natalie Anderson to confront Dr. Berrio in her office with a fraudulent recording of Javon supposedly raping Demoree.

400.    Natalie Anderson was acting in her capacity as Desiree's assistant at ROC Nation when the incident occurred.   Accordingly, all three parties are liable.

401.    Demoree suffered harm as a direct result of the conspiracy, *i.e.* she had to attend, and paid money for, counseling and treatment because of these acts.

402.    Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT III: CIVIL CONSPIRACY FLORIDA LAW
## DESIREE PEREZ, SIG 9, LLC, DANIEL BOBER,
## JAMES FONDO, STEVEN CADY, JESSICA CADY

403.    Demoree re-alleges the allegation contained in paragraphs 1-372 of this Complaint.

404.    Demoree brings this action against Desiree Perez, SIG 9, LLC, Daniel Bober, James Fondo, Steven Cady, and Jessica Cady for the state law tort of civil conspiracy.

405.    Desiree and Daniel Bober entered into an agreement with SIG 9, LLC, James Fondo, Steven Cady, and Jessica Cady, all owners of SIG, 9, LLC, to achieve the common goal of luring Demoree to a parking lot in Dania Beach so that Dr. Bober could falsely imprison Demoree by improperly using Florida's Baker Act statute, even though Demoree did not meet the criteria.

406.    The abovementioned Defendants committed, or conspired to commit, unlawful acts or used unlawful means to further their plan, *i.e.* placed a tracker on her car, threatened her, transported her, and ultimately Baker Acted her, all without authority, which violated federal and Florida law (i.e. false imprisonment).

407.    James Fondo, Steven Cady, and Jessica Cady took actions to advance the plan while in their capacity as owners of SIG 9, LLC.

408.    Demoree suffered harm as a direct result of the conspiracy.

409.    Accordingly, the Defendant are liable to Demoree for her damages.

410.     Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT IV: FOURTH AMENDMENT VIOLATION
## DESIREE PEREZ UNLAWFULLY DETAINED DEMOREE (BAKER ACT)

411.     Demoree re-alleges the allegation contained in paragraphs 1-372 of this Complaint.

412.     Demoree brings this action against Desiree Perez pursuant to title 42, section 1983, United States Code, for the deprivation of her civil rights caused by Desiree Perez.

413.     Desiree Perez intentionally conspired with others to commit an act that violated Demoree's Fourth Amendment right not to be seized or imprisoned without probable cause.

414.     Desiree's conduct caused injury to Demoree.

415.     Although Desiree is not a state official, she acted under color of state law by engaging in joint actions with one or more state officials to deprive Demoree of a federal right, *i.e.* the right to be free from unlawful seizures.

416.     Desiree reached an understanding in some manner with state actors to do an act that deprived Demore of her right to be free from unlawful seizures.

417.     Desiree willfully participated in a joint effort with the state to deprive Demoree of her right to be free from unlawful seizures.

418.     No reasonable person could have reasonably believed that probable cause existed to detain or imprison Demoree under Florida's Baker Act statue.

419.     Therefore, Desiree is liable to Demoree pursuant to § 1983.

420.     Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT V: FOURTH AMENDMENT VIOLATION
## DANIEL BOBER UNLAWFULLY DETAINED DEMOREE (BAKER ACT)

421.　Demoree re-alleges the allegation contained in paragraphs 1-372 of this Complaint.

422.　Demoree brings this action against Daniel Bober pursuant to title 42, section 1983, United States Code, for the deprivation of her civil rights caused by Daniel Bober.

423.　Daniel Bober intentionally committed, or intentionally conspired with others to commit, an act that violated Demoree Fourth Amendment right not to be seized or imprisoned without probable cause.

424.　Daniel Bober's conduct caused injury to Demoree.

425.　Dr. Bober was acting under color of state law as a psychiatrist at South Broward Health District when he committed such acts.

426.　Alternatively, even if Daniel Bober is not a state official, he:

　　a.　acted under color of state law by engaging in joint actions with one or more state officials to deprive Demoree of a federal right, *i.e.* the right to be free from unlawful seizures.

　　b.　reached an understanding in some manner with state actor(s) to do an act that deprived Demore of her right to be free from unlawful seizures.

　　c.　willfully participated in a joint effort with the state to deprive Demoree of her right to be free from unlawful seizures.

427.　No reasonable person could have reasonably believed that probable cause existed to detain or imprison Demoree under Florida's Baker Act statue.

428.　Therefore, Daniel Bober is liable to Demoree pursuant to § 1983.

429.     Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT VI: FOURTH AMENDMENT VIOLATION
## JAMES FONDO, STEVEN CADY, AND JESSICA CADY
## UNLAWFULLY DETAINED DEMOREE (BAKER ACT)

430.     Demoree re-alleges the allegation contained in paragraphs 1-372 of this Complaint.

431.     Demoree brings this action against James Fondo, Steven Cady, and Jessica Cady, individually, pursuant to title 42, section 1983, United States Code, for the deprivation of her civil rights caused by James Fondo.

432.     James Fondo, Steven Cady, and/or Jessica Cady intentionally conspired with others to commit an act that violated Demoree Fourth Amendment right not to be seized or imprisoned without probable cause.

433.     James Fondo, Steven Cady, and/or Jessica Cady's conduct caused injury to Demoree.

434.     Although James Fondo, Steven Cady, and Jessica Cady are not state officials, they acted under color of state law by engaging in joint actions with one or more state officials to deprive Demoree of a federal right, *i.e.* the right to be free from unlawful seizures.

435.     James Fondo, Steven Cady, and/or Jessica Cady reached an understanding in some manner with state actor(s) to do an act that deprived Demore of her right to be free from unlawful seizures.

436.     James Fondo, Steven Cady, and/or Jessica Cady willfully participated in a joint effort with the state to deprive Demoree of her right to be free from unlawful seizures.

437.    No reasonable person could have reasonably believed that probable cause existed to detain or imprison Demoree under Florida's Baker Act statue.

438.    Therefore, James Fondo, Steven Cady, and Jessica Cady are all individually liable to Demoree pursuant to § 1983.

439.    Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT VII: FOURTH AMENDMENT VIOLATION JORDAN DENIS AND JOSEPH REYES UNAWFULLY DETAINED DEMOREE (BAKER ACT)

440.    Demoree re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

441.    Demoree brings this action pursuant to title 42, section 1983, United States Code, for the deprivation of her civil rights caused by unknown Broward County Sheriff Jordan Denis and Joseph Reyes.

442.    Jordan Denis and Joseph Reyes intentionally committed an act that violated Demoree's Fourth Amendment right not to be seized or imprisoned without probable cause.

443.    Jordan Denis and Joseph Reyes conduct caused injury to Demoree.

444.    Jordan Denis and Joseph Reyes were acting under color of state law as police officers when they committed such acts.

445.    No reasonable police officer could have reasonably believed that probable cause existed to seize or imprison Demoree under Florida's Baker Act statute.

446.    Therefore, Jordan Denis and Joseph Reyes are liable to Demoree pursuant to § 1983.

447.     Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT VIII: STATE LAW FALSE ARREST/IMPRISONMENT
## DESIREE PEREZ FALSELY IMPRISONED DEMOREE UNDER FLORIDA LAW

448.     Demoree re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

449.     This action is brought by Demoree for the state law tort of false imprisonment under Florida law against Desiree Perez.

450.     Desiree Perez conspired with Daniel Bober, Sig 9, LLC, James Fondo, Steven Cady, and Jessica Cady, to intentionally restrain Demoree under circumstances that were unreasonable and unwarranted, and without legal authority, which caused harm to Demoree.

451.     Specifically, Desiree Perez directed Daniel Bober, James Fondo, Steven Cady, and Jessica Cady to detain, or assisted others in detaining, Demoree without a warrant or probable cause to believe that she met the Baker Act criteria.

452.     Desiree conspired with, retained, and/or compensated Daniel Bober, James Fondo, Steven Cady, and Jessica Cady as a doctor and private investigators when they unlawfully detained Demoree.

453.     Accordingly, Desiree Perez is liable to Demoree for the injuries caused the individual retained by Desiree.

454.     Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### COUNT IX: STATE LAW FALSE ARREST/IMPRISONMENT
### SIG 9, LLC FALSELY IMPRISONED DEMOREE UNDER FLORIDA LAW

455.    Demoree re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

456.    This action is brought by Demoree for the state law tort of false imprisonment under Florida law against SIG 9, LLC.

457.    Sig 9, LLC, James Fondo, Steven Cady, and Jessica Cady, intentionally restrained Demoree under circumstances that were unreasonable and unwarranted, and without legal authority, which caused harm to Demoree.

458.    Specifically, James Fondo, Steven Cady, and Jessica Cady detained, or assisted others in detaining, Demoree without a warrant or probable cause to believe that she met the Baker Act criteria.

459.    James Fondo, Steven Cady, and Jessica Cady either owned or were employed by Sig 9, LLC as private investigators and were acting within the scope of their employment when they unlawfully detained Demoree.

460.    Accordingly, Sig 9, LLC is liable to Demoree for the injuries caused by its owners and/or employees.

461.    Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### COUNT X: STATE LAW FALSE ARREST/IMPRISONMENT
### JAMES FONDO, STEVEN CADY, AND/OR JESSICA CADY
### FALSELY IMPRISONED DEMOREE UNDER FLORIDA LAW

462.    Demoree re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

463.     This action is brought by Demoree for the state law tort of false imprisonment under Florida law against James Fondo, Steven Cady, and/or Jessica Cady.

464.     James Fondo, Steven Cady, and/or Jessica Cady, intentionally restrained Demoree under circumstances that were unreasonable and unwarranted, and without legal authority, which caused harm to Demoree.

465.     Specifically, James Fondo, Steven Cady, and/or Jessica Cady detained, or assisted others in detaining, Demoree without a warrant or probable cause to believe that she met the Baker Act criteria.

466.     James Fondo, Steven Cady, and Jessica Cady were acting as private investigators when they unlawfully detained Demoree.

467.     Accordingly, James Fondo, Steven Cady, and Jessica Cady are all individually liable to Demoree for her injuries.

468.     Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### COUNT XI:  STATE LAW FALSE ARREST/IMPRISONMENT – BROWARD COUNTY SHERIFF'S OFFICE FALSELY IMPRISONED DEMOREE UNDER FLORIDA LAW

469.     Demoree   re-alleges   the   allegations   contained   in   paragraphs   1-372   of   this Complaint.

470.     This action is brought by Demoree for false arrest and false imprisonment under state law, pursuant to the Broward County Sheriff's Office's waiver of sovereign immunity under Florida Statute 768.28.

471.     The Broward County Sheriff's Office, via Jordan Denis and Joseph Reyes, intentionally restrained Demoree under circumstances that were unreasonable and unwarranted, and without legal authority, which caused harm to Demoree.

472.     Specifically, Jordan Denis and Joseph Reyes unlawfully detained Demoree without a warrant or probable cause to believe that she met the Baker Act criteria.

473.     Jordan Denis and Joseph Reyes were employed as police officers with the Broward County Sheriff's Office when they detained Demoree.

474.     Accordingly, the Broward County Sheriff's Office is liable to Demoree for the injuries caused by its officers.

475.     Wherefore, Demoree seeks all economic and non-economic damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### COUNT XII:  STATE LAW FALSE ARREST/IMPRISONMENT – SOUTH BROWARD HOSPITAL DISTRICT FALSELY IMPRISONED DEMOREE UNDER FLORIDA LAW

476.     Demoree   re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

477.     This action is brought by Demoree for false arrest and false imprisonment under state law, pursuant to the Broward County Sheriff's Office's waiver of sovereign immunity under Florida Statute 768.28.

478.     South Broward Hospital District, via Dr. Daniel Bober, intentionally restrained Demoree under circumstances that were unreasonable and unwarranted, and without legal authority, which caused harm to Demoree.

479. Specifically, Dr. Bober kept Demoree detained, or extended her detention, under the Baker Act without a warrant or probable cause to believe that she met the Baker Act criteria, or continued to meet the Baker Act criteria.

480. Dr. Bober, other doctors, and staff were employed with South Broward Hospital District when they detained Demoree or prolonged her detention.

481. Accordingly, South Broward Hospital District is liable to Demoree for the injuries caused by its employees.

482. Wherefore, Demoree seeks all economic and non-economic damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT XIII: NEGLIGENCE
## SOUTH BROWARD HOSPITAL DISTRICT

483. Demoree re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

484. This action is brought by Demoree for negligence under state law, pursuant to the South Broward Hospital District's ("South Broward") waiver of sovereign immunity under Florida Statute 768.28.

485. South Broward had a legal obligation to exercise a reasonable duty of care towards Demoree while she was a patient at Memorial Regional Hospital.

486. South Broward breached that duty by failing to maintain sufficient protocols for doctors initiating an involuntary civil commitment under Florida's Baker Act statute.

487. South Broward also breached that duty by failing to adequately supervise and/or train its staff to ensure that patients are not being unlawfully detained under Florida's Baker Act statute.

488.    When Demoree told South Broward's staff that Dr. Bober conspired with her mother, and that Dr. Bober instituted a Baker Act without an evaluation, South Broward had a duty to act appropriately, but failed to do so.

489.    South Broward's breach of duty was the direct and proximate cause of Demoree's injuries.

490.    Demoree has suffered actual damages as a result of South Broward's negligence.

491.    Wherefore, Demoree seeks all economic and non-economic damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### COUNT XIV: VIOLATION OF FLORIDA'S MARCHMAN ACT
### DANIEL BOBER, ODYSSEY BEHAVIORAL HEALTHCARE, AND
### LIFE SKILLS SOUTH FLORIDA OUTPATIENT, LLC

492.    Demoree re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

493.    Demoree brings this action against Daniel Bober, Life Skills South Florida Outpatient, LLC, and Odyssey Behavioral Healthcare,  pursuant to Section 397.501(10)(a) of the Florida Statutes, for damages caused by Daniel Bober and staff.

494.    Daniel Bober negligently caused or otherwise secured emergency or other involuntary procedures or treatments for an addiction that Demoree did not have.

495.    Daniel Bober, either knew, or should have known that Demoree did not qualify for services because of her negative drug test(s).

496.    Nevertheless, Daniel Bober and staff allowed Demoree to be admitted to, or remain in, Life Skills under Florida's Marchman Act.

497.    Daniel Bober's act of treating Demoree for an addiction she did not have violated her dignity to be admitted or retained in such a facility, her right to receive services suited to her needs, and/or her right to communicate with the outside world.

498.    Daniel Bober, Life Skills, and Odyssey Behavioral Healthcare were service providers who abused or neglected the abovementioned rights of Demoree.

499.    Daniel Bober was not acting in good faith, reasonably, and without negligence in connection with the preparation or execution of petitions or other documents relating to Demoree's detention, discharge, examination or treatment.

500.    Accordingly, Life Skills, Odyssey Behavioral Healthcare, and Daniel Bober are all individually liable for the acts, or lack thereof, as stated above.

501.    Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT XV: NEGLIGENCE
### ODYSSEY BEHAVORIAL HEALTH AND
### LIFE SKILLS SOUTH FLORIDA OUTPATIENT, LLC

502.    Demoree re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

503.    This action is brought by Demoree for negligence under state law against Life Skills South Florida Outpatient, LLC ("Life Skills") and Odyssey Behavioral Healthcare ("Odyssey").

504.    Life Skills and Odyssey had a legal obligation to exercise a reasonable duty of care towards Demoree while she was a patient at Life Skills.

505.    Life Skills breached that duty by failing to maintain proper protocols for doctors affiliated with the facility.

506.     Life Skills also breached that duty by failing to adequately supervise and/or train its staff to ensure that patients are not being unlawfully detained under Florida's Marchman Act statute.

507.     When Demoree told Life Skill's staff that Dr. Bober conspired with her mother to have her wrongfully detained, Life Skills had a duty to act, but failed to do so.

508.     Moreover, when Life Skills became aware of Demoree's negative drug test(s), Life Skills had a duty to act, but failed to do so.

509.     Life Skill's breach of duty was the direct and proximate cause of Demoree's injuries.

510.     Demoree has suffered actual damages as a result of Life Skill's negligence.

511.     Wherefore Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT XVI:  VIOLATION OF THE STORED COMMUNICATIONS ACT DESIREE PEREZ & ROC NATION[16]

512.     Demoree re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

513.     Demoree asserts this claim for relief against the Desiree Perez and ROC Nation pursuant to 18 U.S.C. § 2701 of the Federal Stored Communications Act ("SCA").

514.     Demoree's cell phone, text messages, and photographs stored in her iCloud account are used in and affect interstate or foreign commerce.

---

[16] This cause of action is a modified version of the cause of action Desiree filed against Javon in *Perez et al v. Hadley*, SDFL Case No. 25-cv-21697-RAR, except Demoree's claim is not frivolous.

515.    Demoree regularly uses her cell phone to communicate with Javon within the U.S. for work, which travel across interstate lines.

516.    Demoree also uses her phone for communication, for both personal and business needs.

517.    Demoree took reasonable and appropriate measures to maintain and secure her iCloud account, and at no point did she authorize Desiree or ROC Nation to access her account.

518.    Neither Desiree nor anyone from ROC Nation sought authorization from Demoree to access her iCloud storage account.

519.    The unauthorized access was to a facility to which an electronic communication service was provided.

520.    Desiree and/or ROC Nation violated Demoree's privacy by accessing and potentially storing private and confidential information from iCloud account.

521.    The text messages, photographs, and video that Desiree accessed without permission were electronically stored in interstate commerce.

522.    Desiree and/or ROC Nation intentionally accessed these stored communications without Demoree's authority or approval. Desiree knowingly intercepted Plaintiffs' wire and electronic stored communications, including audio and video, without authorization and with malicious intent to harm and control Demoree and Javon, while satisfying her perverse desires and maintain abusive control over Demoree.

523.    As a direct result of Desiree and ROC Nation's unlawful conduct, Demoree incurred significant losses and damages, spending time, money, and resources to investigate the intrusion, assess the damage—including the deletion and alteration of data caused by Desiree or

ROC Nation's  unauthorized access—and to restore her system to its secure and original state, and other damages not currently known.

524.    Desiree and ROC Nation's actions were knowing, intentional, wanton, and willful. As a result of Desiree and ROC Nation's action, Demoree has sustained and will continue to sustain damages in an amount to be determined at trial.  Demoree is entitled to compensatory damages, statutory damages of $1,000 per violation, and other fees and costs to be determined at trial.

525.    Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

## COUNT XVII: VIOLATION OF FEDERAL WIRETAP ACT, 18 U.S.C. § 2511[17]
### DESIREE PEREZ

526.    Demoree incorporates paragraphs 1-372 of this Complaint as though fully set forth herein.

527.    Desiree, without authorization or consent, intentionally intercepted, endeavored to intercept, and/or procured another person to intercept Demoree and Javon's wire, oral, and electronic communications, in violation of 18 U.S.C. § 2511.

528.    Desiree knowingly and willfully accessed Demoree and others' private communications, including audio and visual transmissions, by placing audio and visual recording devices in her bedroom without her permission.

529.    Desiree directly intercepted communications between Demoree and Javon (and others).

---

[17] This cause of action is a modified version of the cause of action Desiree filed against Javon in *Perez et al v. Hadley*, SDFL Case No. 25-cv-21697-RAR, except Demoree's claim is not frivolous.

530.     Desiree's interception of communications was done with the malicious intent to harm Demoree and to maintain abusive control over Demoree, in violation of federal law.

531.     As a direct result of Desiree's actions, Demoree has suffered actual damages, including but not limited to emotional distress, invasion of privacy, and harm to her personal and professional life, in addition to incurring costs associated with investigating and remedying the interception.

532.     Wherefore, Demoree seeks all available damages, including actual damages, punitive damages, liquidated damages of $100 per day for each day of violation (or $1,000, whichever is greater), and reasonable attorney's fees and costs incurred in prosecuting this action.

## COUNT XVIII: VIOLATION OF FLORIDA SECURITY OF COMMUNICATIONS ACT, § 934.10, FLA. STAT. [18]
### DESIREE PEREZ

533.     Demoree incorporates paragraphs 1-372 of this Complaint as though fully set forth herein.

534.     Desiree violated Fla. Stat. § 934.03 by intentionally intercepting, both directly and indirectly, Demoree's private wire, oral, and electronic communications.

535.     Desiree knowingly and willfully intercepted audio and visual transmissions of Demoree and Javon loved ones by placing recording devices in Demoree's bedroom without her consent.

536.     Desiree knowingly and willfully intercepted Demoree's wire and other electronic communications, including audio and video, without authorization and with malicious intent, intending to harm, monitor, and maintain abusive control over Demoree.

---

[18] This cause of action is a modified version of the cause of action Desiree filed against Javon in *Perez et al v. Hadley*, SDFL Case No. 25-cv-21697-RAR, except Demoree's claim is not frivolous.

537.     Wherefore, Demoree seeks all relief available under § 934.10, Fla. Stat., including actual damages (not less than liquidated damages of $100 per day for each day of violation, or $1,000, whichever is greater), punitive damages, reasonable attorney's fees, litigation costs, and any further relief the Court deems just and proper.

## COUNT XIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## DESIREE PEREZ, DANIEL BOBER, JAMES FONDO,
## STEVEN CADY, JESSICA CADY

538.     Demoree incorporates paragraphs 1-372 of this Complaint as though fully set forth herein.

539.     This is a cause of action for intentional infliction of emotional distress by Demoree against Desiree Perez, Daniel Bober, James Fondo, Steven Cady, and Jessica Cady.

540.     The Defendants (and others) conspired to engage and did engage in intentional conduct that they knew or should have known would cause emotional distress to Demoree.

541.     The Defendants knew their conduct was outrageous and went beyond all bounds of decency.

542.     The Defendants know that forcing Demoree into an unmarked grey pick-up truck with no insignia on it, and taking her to a hospital to be evaluated by a doctor she never met, who was being paid by her mother, was outrageous and went beyond all bounds of decency.

543.     They knew their actions would cause Demoree severe emotional distress.

544.     As a direct and proximate result of the Defendants' intentional conduct, Demoree has suffered severe emotional distress.

545.     Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, litigation costs, and any further relief the Court deems proper and just.

## COUNT XX: FRAUDULENT MISREPRESENTATION/INDUCEMENT
### ICONIC CREATIVE, LLC

546.    Demoree incorporates paragraphs 1-372 of this Complaint as though fully set forth herein.

547.    This is a cause of action for fraudulent misrepresentation by Demoree against Iconic Creative, LLC ("Iconic").

548.    Liz and Benny, as owners/employees of Iconic, made a false statement to Demoree in the scope of their employment, which Demoree actually and detrimentally relied upon to attend a mental health counseling session, which was fraudulently couched as a "training."

549.    Liz and Benny knew the statements were false or made them recklessly without regard for their truth.

550.    Liz and Benny intended for Demoree to rely on their false statements, which resulted in injury to Demoree.

551.    Specifically, Demoree has attended and paid for counseling sessions because of Iconic's (and others) abhorrent conduct.

552.    Wherefore, Demoree seeks all relief available, including economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems just and proper.

## COUNT XXI: FRAUDULENT MISREPRESENTATION/INDUCEMENT
### RACHEL BERNSTEIN

553.    Demoree incorporates paragraphs 1-372 of this Complaint as though fully set forth herein.

554.    This is a cause of action for fraudulent misrepresentation by Demoree against Rachel Bernstein.

555.    Rachel Bernstein made a false statement to Demoree, which caused Demoree to attend and/or remain at mental health counseling session, which was fraudulently couched as a "training."

556.    Rachel Bernstein knew the statements were false or made them recklessly, without regard for their truth.

557.    Rachel Bernstein intended that Demoree rely on her false statements, which resulted in injury to Demoree.

558.    Specifically, Demoree has attended and paid for counseling sessions because of Iconic's (and others) abhorrent conduct.

559.    Wherefore, Demoree seeks all relief available, including economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems just and proper.

### COUNT XXII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ICONIC CREATIVE, LLC & RACHEL BERNSTEIN

560.    Demoree incorporates paragraphs 1-372 of this Complaint as though fully set forth herein.

561.    This is a cause of action for intentional infliction of emotional distress by Demoree against Iconic Creative, LLC ("Iconic") and Rachel Bernstein.

562.    The Defendants (and others) engaged in intentional conduct that they knew or should have known would cause emotional distress to Demoree.

563.    The Defendants knew their conduct was outrageous and went beyond all bounds of decency.

564.    Iconic knew that lying to Demoree about a Nike Academy training, when the real purpose was to perform a mental health evaluation by a sex cult therapist, was outrageous and went beyond all bounds of decency.

565.    Demoree relied upon Iconic's false representations in the text message and was essentially forced to attend the supposed "Nike Academy" training.

566.    Moreover, Rachel Berstein knew that pretending to conduct a training on behalf of Nike, when the real purpose was to perform a mental health evaluation by a sex cult therapist, was outrageous and went beyond all bounds of decency.

567.    Both Defendants knew their actions would cause Demoree severe emotional distress.

568.    As a direct and proximate result of the Defendants' intentional conduct, Demoree has suffered severe emotional distress and has attended and paid for counseling sessions because of Defendants' abhorrent conduct.

569.    Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### COUNT XXIII: NEGLIGENCE
### CTS RESEARCH, INC.

570.    Demoree re-alleges the allegations contained in paragraphs 1-372 of this Complaint.

571.    This action is brought by Demoree for negligence under state law against CTS Research, Inc. ("CTS").

572.    CTS had a legal obligation to exercise a reasonable duty of care towards Demoree and the public when hiring or contracting private investigators to perform jobs.

573.     CTS breached that duty by failing to verify and mandate that investigators hired or contracted by CTS were licensed and trained, specifically, not to follow people 24 hours a day, seven days a week, including in cars at extremely close distances.

574.     CTS's breach of duty was the direct and proximate cause of Demoree's injuries.

575.     Demoree has suffered damages because of CTS's negligence.

576.     Wherefore Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### COUNT XXIV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CTS RESEARCH, INC.

577.     Demoree incorporates paragraphs 1-372 of this Complaint as though fully set forth herein.

578.     This is a cause of action for intentional infliction of emotional distress by Demoree against CTS Research, Inc. ("CTS").

579.     CTS, through their employees and contractors, engaged in intentional conduct that it knew or should have known would cause emotional distress to Demoree, *i.e.* allowing its employees, agents, and/or investigators, either licensed or not, to follow Demoree and her boyfriend 24 hours a day, seven days a week, including in cars at extremely close distances while armed with firearms.

580.     CTS knew its conduct was outrageous and went beyond all bounds of decency.

581.     CTS knew that its actions would cause Demoree severe emotional distress.

582.     As a direct and proximate result of the Defendants' intentional conduct, Demoree has suffered severe emotional distress and has attended and paid for counseling sessions because of Defendant's (and others) abhorrent conduct.

583.     Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### COUNT XXV - MALICIOUS PROSECUTION FLORIDA LAW – DESIREE PEREZ

584.     Demoree incorporates paragraphs 1-372 of this Complaint as though fully set forth herein.

585.     This is a cause of action for malicious prosecution against Desiree Perez under Florida law.

586.     Desiree Perez instituted or continued a Baker Act, Marchman Act, and/or Guardianship legal proceeding against Demoree.

587.     Desiree instituted the proceedings with malice.

588.     Desiree did not have probable cause to institute the abovementioned proceedings.

589.     Desiree caused damages to Demoree by instituting or continuing the proceedings.

590.     Wherefore, Demoree seeks all economic and non-economic damages, punitive damages, reasonable attorneys' fees, litigation costs, and any further relief the Court deems proper and just.

### DEMAND FOR JURY TRIAL

Demoree Hadley demands a jury trial of all issues so triable as of right by a jury.

DATED: June 3, 2025.


Dated June 3, 2025.

Respectfully submitted,

94

Hilton Napoleon Esq., FBN 17593
2525 Ponce de Leon Blvd., Suite 300
Coral Gables, Florida 33134
Telephone: 305-510-7106
hilton@napoleonfirm.com
assistant@napoleonfirm.com

*Counsel for the Plaintiff, Demoree Hadley*

By: /s/ *Hilton Napoleon, II*
        Hilton Napoleon, II