**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-22162-BLOOM/Louis**

DEMOREE HADLEY,

     Plaintiff,

v.

DESIREE PEREZ, ROC NATION, ICONIC
CREATIVE, LLC, DANIEL BOBER,
NATALIE ANDERSON, SIG 9, LLC, JAMES
FONDO, STEVEN CADY, JESSICA CADY,
SOUTH BROWARD HOSPITAL DISTRICT,
ODYSSEY BEHAVIORAL HEALTHCARE,
LIFE SKILLS SOUTH FLORIDA
OUTPATIENT, LLC, BROWARD COUNTY
SHERIFF'S OFFICE, JOHN DOE #1,
JOHN DOE #2, and RACHEL BERNSTEIN,

     Defendants.

_____/

## ORDER ON MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Counter-Defendant Demoree Hadley's ("Hadley")

Motion to Dismiss Daniel Bober's Counterclaim Complaint, ECF No. [281] ("Motion"). Counter-

Plaintiff Daniel Bober ("Dr. Bober") filed a Response in Opposition, ECF No. [306]. The Court

has reviewed the Motion, the supporting and opposing submissions, the record, and is otherwise

fully advised. For the reasons that follow, Hadley's Motion is denied.

### I.     BACKGROUND

#### A.  Hadley's Involuntary Examination

In October 2023, Dr. Bober—a psychiatrist who served as the Chief of the Department of

Psychiatry at Memorial Regional Healthcare System in Hollywood, Florida—was introduced to

Hadley's mother, Desiree Perez ("Perez"). ECF No. [256] ¶¶ 22, 25. Perez contacted Dr. Bober

seeking his professional opinion regarding appropriate psychiatric intervention for Hadley and inquiring whether an involuntary psychiatric evaluation pursuant to the Baker Act might be warranted. *Id.* ¶ 26.

Between October 2023 and March 2024, Perez contacted Dr. Bober multiple times, expressing severe concern for Hadley's mental health and wellbeing based on family accounts and information she had obtained. *Id.* ¶ 27. Perez shared with Bober that she believed Hadley's then-boyfriend, Javon Hadley, had physically and sexually abused Hadley on multiple occasions and more generally mistreated and controlled her. *Id.* ¶ 28. Perez conveyed that she had reported Javon Hadley's abuse to Miami-Dade County State Attorney's Office, Javon Hadley had been arrested in response, and police were actively investigating the relevant allegations. *Id.* ¶ 29.

On March 26, 2024, Perez informed Dr. Bober that Hadley had threatened to commit suicide by drug overdose that day. *Id.* ¶ 30. That evening, Perez informed Dr. Bober that she heard Hadley, on a phone call earlier that day, tell a longstanding family friend that she was going to "take pills and kill herself, just now" because the family friend had disclosed Javon Hadley's rape and abuse of Hadley to Hadley's psychologist. *Id.* ¶ 31. Perez further expressed that, later that same day, Hadley made erratic, delusional, and false statements to third parties, including statements, (a) that her grandfather had raped both her and her brother, (b) that she witnessed her father pulling someone's eyes out, and (c) that she witnessed her father tie up her siblings with belts. *Id.* ¶ 32. Perez described Hadley as "unhinged" and cautioned Dr. Bober that, if not immediately treated, Hadley would hurt herself. *Id.* ¶ 33. Perez further expressed that Hadley was "either on drugs or had just completely lost her mind." *Id.* ¶ 34.

The next day—March 27, 2024—Perez advised Dr. Bober that the prior evening, Hadley was "speaking in delirium" during a phone call; however, later in the evening, she presented as

"calm" and "extremely serene," deepening Perez's concern that Hadley was abusing drugs and was at imminent risk of self-harm. *Id.* ¶ 35. Dr. Bober asked Perez if there was anyone else Hadley had been in contact with recently so that he could speak with them and corroborate Perez's account of Hadley's condition. *Id.* ¶ 36. Perez recommended that Dr. Bober speak to the longstanding family friend, as well as Hadley's aunt. *Id.* ¶ 37.

That same day, Dr. Bober spoke with both parties. *Id.* ¶ 38. The family friend, who identified herself as being a friend of 20 years, told Dr. Bober that, "as recently as March 26, 2024, Hadley had been fabricating stories about events that never occurred." *Id.* ¶ 39. For example, on a phone call, Hadley told the family friend that multiple family members had been raped. *Id.* The family friend conveyed to Dr. Bober that, during that same call, Hadley had threatened to take her own life by overdosing on pills. *Id.* Hadley's aunt told Dr. Bober that Hadley's behavior was "erratic" and "out of control," that Hadley had paranoid delusions that people were out to harm her, and that Hadley felt she was being followed. *Id.* ¶ 40.

Based on the information conveyed by Perez, Hadley's family friend, and Hadley's aunt—including Hadley's explicit threat to take her own life by overdose—Dr. Bober determined that an immediate psychiatric evaluation was warranted to assess whether Hadley met the criteria for an involuntary examination under the Baker Act. *Id.* ¶ 41. Perez explained that Hadley would likely refuse to submit voluntarily to any psychiatric evaluation, so Dr. Bober arranged to meet with Hadley at the Dania Beach Marina ("Marina") to conduct a psychiatric examination. *Id.* ¶ 42. Sig 9, LLC ("Sig 9"), a private security firm, was retained to attend the meeting that the Marina. *Id.* ¶ 43. Sig 9 coordinated with the Broward County Sheriff's Office to have law enforcement officers present during the meeting. *Id.* ¶ 44.

Later in the afternoon on March 27, 2024, Hadley arrived at the Marina. *Id.* ¶ 45. Dr. Bober introduced himself and told Hadley that Perez and other family members had informed him of Hadley's recent statements regarding her intent to commit suicide by drug overdose. *Id.* ¶ 46. Dr. Bober further conveyed that he intended to examine Hadley to determine whether she qualified for involuntary examination under the Baker Act. *Id.* ¶ 47. Hadley denied taking drugs or having any intention of committing suicide. *Id.* ¶ 48.

However, based on his experience, Dr. Bober believed it was "common for individuals suffering from mental illness to deny their symptoms or need for treatment. Indeed, oftentimes, these individuals are either undiagnosed, unmedicated, delusional, or simply in denial regarding their condition." *Id.* ¶ 49. Similarly based on his experience, Dr. Bober knew that it was common for suicidal individuals to be reluctant to admit their intentions when confronted. *Id.* ¶ 50. Therefore, it would not have been "medically or clinically appropriate" for Dr. Bober to have accepted Hadley's denial at face value. *Id.* ¶ 51.

Hadley told Dr. Bober about her therapist, a licensed psychologist at the South Miami Psychology Group. *Id.* ¶ 53. Hadley provided her psychologist's phone number to Dr. Bober and gave him express permission to speak with the psychologist. *Id*. Dr. Bober immediately called Hadley's psychologist, who told him that "she was deeply concerned for Hadley's wellbeing, particularly because Hadley strictly limited" the psychologist's contact with others and, as a result, the psychologist's entire understanding of Hadley's condition was based on her own reports. *Id.* ¶ 54. Based on his in-person examination at the Marina and the information conveyed by Hadley's psychologist, Hadley's family friend, Hadley's step-grandmother, Hadley's aunt, and Perez— including Hadley's recent threat to end her life—Dr. Bober determined that there was reason to believe Hadley was suffering from mental illness at the time and that, because of that illness, she

was unable to determine whether examination was necessary. *Id.* ¶ 55. Further, Dr. Bober found that there was a substantial likelihood that, without care or treatment, Hadley would cause serious bodily harm to herself in the near future. *Id.* This qualified her to be taken to a receiving facility for an involuntary examination under the Baker Act. *Id.*

Dr. Bober explained this determination to Hadley and asked if she would, instead, submit to a voluntary examination. *Id.* ¶ 56. Hadley refused, and around 6 p.m. on March 27, 2024, Dr. Bober executed the Certificate of Professional Initiating Involuntary Examination (the "Baker Act Certificate"). Officers from the Broward County Sheriff's Office transported Hadley to Memorial Regional Hospital, a designated receiving facility. *Id.* ¶ 59.

Although the Baker Act allows for involuntary examination periods of up to 72 hours, the doctors at Memorial Regional Hospital elected to release Hadley after 38 hours because, "after conducting a thorough psychiatric examination, they concluded that Hadley failed to present any acute psychiatric symptoms that placed her at imminent risk of serious bodily harm to herself or others in the near future." *Id.* ¶ 60.

### B. Hadley's Subsequent Care

Before Hadley could be discharged, at approximately 3:00 p.m. on March 28, 2024, the psychiatry unit at the hospital received a Marchman Act Order. *Id.* ¶ 61. The Order identified Perez as the "Petitioner" who petitioned the court for the "involuntary assessment and/or stabilization" of Hadley. *Id.* ¶ 62. The court granted Perez's *ex parte* petition, finding "a good faith reason to believe" Hadley was either impaired by substance abuse or had a co-occurring mental health disorder that impeded her ability to execute self-control with respect to the substance abuse. *Id.* ¶ 63. The court found intervention needed and ordered that the Broward County Sheriff's Office

take Hadley into custody and bring her to Life Skills in Deerfield. *Id.* at ¶ 63–64. Hadley was transferred to Life Skills on March 28, 2024, and released on April 8, 2024. *Id.* ¶ 69.

Dr. Bober had no knowledge of or involvement in the petition that led to the Marchman Act Order or the issuance of the Marchman Act Order. *Id.* at ¶ 65–66. He first learned of the Marchman Act Order following Hadley's planned discharge from the hospital on March 28, 2024. *Id.* ¶ 67.

### C. Hadley's Allegedly Defamatory Actions

On May 9, 2025, Hadley filed the instant action. *Id.* ¶ 70. On June 3, 2025, she filed an Amended Complaint. *Id.* ¶ 71. On October 8, 2025, the Court dismissed Counts XIV and XIX against Dr. Bober. *Id.* ¶ 72.

Hadley maintains and controls an Instagram account and an X (formerly Twitter) account. *Id.* ¶ 74. Hadley has over 3,400 followers on Instagram and over 4,800 on X. *Id.* ¶ 75. However, because both profiles are public, Hadley's accounts are "viewable, accessible, and shareable by the millions of users of each platform." *Id.* ¶ 76.

On May 28, 2025, Hadley began posting about Dr. Bober on her Instagram and X accounts, engaging in what Dr. Bober describes as a "defamatory campaign." *Id.* ¶ 77. For example, she uploaded a post to her Instagram story stating that she was "abducted" by Dr. Bober and accusing Dr. Bober of having been part of a "team" of "abusers." *Id.* ¶ 78.

Also in May 2025, Hadley was interviewed by NBC 6 South Florida, a prominent news outlet, regarding her claims. *Id.* ¶ 79. "On May 27 and 29, 2025, NBC 6 news published two multi-page articles and accompanying video segments—each over five minutes long—concerning Hadley's false accusations." *Id.* ¶ 80. Among other things, Hadley claimed that Perez "conspired" with Dr. Bober to have Hadley committed for a mental health evaluation. *Id.* ¶ 81. On May 28 and

29, 2025, Hadley shared the NBC 6 news stories on her Instagram profile, reiterating her claims of "abuse" and stating that "multiple corrupt" and "paid individuals" took part in her abuse. *Id.* ¶ 82. On May 28, 2025, Hadley posted a photograph of Dr. Bober on her Instagram story, further identifying him as the "man she accused of abducting and abusing her." *Id.* ¶ 83.

On June 5, 2025, "Hadley began to continuously post on her Instagram page and Instagram story pictures and videos of Dr. Bober, accompanied by false, defamatory and malicious captions and commentary." *Id.* ¶ 84. For example, on June 5, 2025, Hadley posted a photograph identifying Dr. Bober, a photograph of Dr. Bober alongside colleagues from Life Skills, and a video clip from March 27, 2024, with a caption stating that Dr. Bober had been "paid" by Perez. *Id.* ¶ 84(a).

On June 6, 2025, she again posted the photograph of Dr. Bober alongside his Life Skills colleagues to her Instagram page. *Id.* ¶ 84(b). In another post from that same day, she posted a photograph of Dr. Bober with a caption implying that he had been "paid" to subject her to the Baker Act. *Id.* Hadley further posted to her X account again, again accusing Dr. Bober of "abducting" her. *Id.* ¶ 84(c).

On June 13, 2025, Hadley posted a caption on her Instagram page accusing Dr. Bober of "harassing" and "abus[ing]" her and her husband. *Id.* ¶ 84(d). On June 21, 2025, Hadley again posted a photograph of Bober on her X account, accusing him of having "abducted" her. *Id.* ¶ 84(e). On June 22, 2025, Hadley posted pictures of Dr. Bober and others on her Instagram story with the caption, "Let's make these go viral too since they abducted me." *Id.* ¶ 84(f).

On other occasions, Hadley shared statements made by other parties. *Id.* ¶ 85. On May 30, 2025, an Instagram user shared one of Hadley's Instagram posts regarding the NBC 6 videos. *Id.* ¶ 85(a). After thanking the user for sharing, Hadley responded, "Yes," to another user's question, "[S]o they basically used a [B]aker [A]ct to kidnap you?" *Id.* On June 2, 2025, Hadley reposted an

X post that stated that "everyone involved" in her Baker Act examination "should be in prison." *Id.* ¶ 85(b).

Dr. Bober alleges that the accusations that he "abducted," "kidnapped," or "harassed" her were defamatory. *Id.* ¶¶ 87–89. Similarly, the accusations that Dr. Bober was part of a "team" of abusers, was "paid money" in connection with Hadley's alleged abduction or "should be in prison" were defamatory. *Id.* ¶¶ 90–92.

Hadley's story ultimately did "go viral." *Id.* ¶ 94. On June 20, 2025, "an internationally acclaimed musical artist publicly endorsed Hadley's defamatory narrative by posting the hashtag #JusticeForDem to her X account, which boasts over 28 million followers. Hadley publicly thanked the artist for her support." *Id.* ¶ 95. Within an hour of the artist's post, the hashtag #JusticeforDem became one of the top 22 trending topics nationwide on X. *Id.* ¶ 96.

### D. Court Order Regarding Extrajudicial Statements

Following the viral spread of Hadley's story, Defendant Roc Nation LLC filed an Expedited Motion for Special Order Regarding Extrajudicial Statements. *Id.* ¶ 97. On June 25, 2025, the Court granted Roc Nation LLC's Motion and ordered that all parties, including Hadley, refrain from giving or authorizing extrajudicial statements or interviews about the case, including through interactions with media outlets or posts on social media or other public platforms. *Id.* ¶ 98.

### E. Hadley's Subsequent Statements

Through June and July 2025, Hadley continued to make public statements about Dr. Bober. *Id.* ¶ 100. Specifically, Hadley participated in a four-part interview series published on a YouTube channel with 99,000 subscribers. *Id.* ¶ 101. The series, titled *Defending Your Freedom: The Demoree Hadley Story*, prominently featured Hadley's allegations against Bober. *Id.* On June 29,

2025, episode three of the series, titled *Power, Psychiatry, & Surveillance*, was published. *Id.* ¶ 102. The 30-minute interview, which has garnered over 7,000 views, reiterated Hadley's claims about a "conspiracy" involving Dr. Bober. *Id.* ¶ 102. During the interview, Hadley stated that Dr. Bober had been "bought" by Perez, Dr. Bober acted in an "unethical way," Dr. Bober was a "disgusting bully" and an "abuser." *Id.* On July 22, 2025, Hadley appeared in episode four of the series. *Id.* ¶ 103. That episode, titled *Betrayals Unveiled—Exposing the Web of Deceit*, has received over 8,900 views. *Id.* In the video, Hadley falsely claimed that Dr. Bober had called her to apologize, admitted that he had "messed up," and stated that he had been "bought" by Perez. *Id.* ¶ 103.

On June 19, 2025, Hadley gave an interview on the YouTube channel, *BJ Investigates*, which has over 319,000 subscribers. *Id.* ¶ 104. In the interview, titled *ROC Nation CEO's Daughter SPEAKS OUT! / Alleged ABDUCTION & Baker Act CORRUPTION*, which has amassed over 150,000 views, Hadley stated that Bober "wanted to essentially [] drug me up to make me drowsy and not be able to talk." *Id.*

Dr. Bober alleges that he "has suffered and continues to suffer damages because of Hadley's knowingly false, defamatory, and injurious campaign. In particular, Dr. Bober has suffered, and will continue to suffer, substantial economic, professional, and reputational damages, including in connection with his reputation and business interests." *Id.* ¶ 105. Following Hadley's accusations, Dr. Bober "received dozens of online threats and accusations, including public calls for revocation of his medical license, and comparisons to criminal figures such as Sean 'Diddy' Combs." *Id.* ¶ 106. Also following Hadley's statements, Dr. Bober was asked to resign from his position as Medical Director of the Jewish Adoption and Foster Care Option. *Id.* ¶ 107.

### F.  Bober's Counterclaim

On November 4, 2025, accompanying his Answer to Hadley's Amended Complaint, Dr. Bober filed his Counterclaim. ECF No. [256] at 69. In it, he alleges defamation in the form of libel (Count I), defamation *per se* in the form of libel (Count II), defamation in the form of slander (Count III), and defamation *per se* in the form of slander (Count IV). *Id.* at 91–95. On December 9, 2025, Hadley moved to dismiss the Counterclaim, contending that her statements were truthful and protected by Florida's anti-SLAPP statute. ECF No. [281] at 10.

## II.  LEGAL STANDARD

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). "To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp.

2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Off.*, 449 F.3d 1342, 1352 (11th Cir. 2006). "[T]he court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (citations omitted).

Although a court primarily considers only facts contained within the four corners of the complaint when ruling on a motion to dismiss, the court may consider an additional document "if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged" *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

## III.  DISCUSSION

For purposes of her Motion to Dismiss, Hadley does not dispute that she published (or republished) each of the social media posts or media statements that Dr. Bober alleges. ECF No. [281] at 10. Instead, she fundamentally argues that her statements were "truthful and protected by Florida's Anti-SLAPP statute." *Id*.

### A.  Florida's Anti-SLAPP Statute

Hadley's first argument is that her speech was protected by Florida's anti-strategic lawsuits against public participation ("anti-SLAPP") statute. *Id*. Florida's anti-SLAPP statute prohibits a plaintiff from filing a lawsuit that is (a) "without merit" and (b) "primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue . . . as protected by the First Amendment to the United States Constitution and s.5, Art. I of the State Constitution." Fla. Stat. § 768.295(3). As used in that statute, "free speech in connection with a

public issue" is "any written or oral statement that is protected under applicable law and is made before a governmental entity in connection with an issue under consideration or review by a governmental entity, or is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." Fla. Stat. § 768.295(2)(a). The Florida legislature enacted the statute to deter such problematic suits, deeming them "inconsistent" with the constitutional right of free speech—the preservation of which is a "fundamental state policy[.]" Fla. Stat. § 768.295(1)

Hadley argues that the Counterclaim should be dismissed because Hadley's lawsuit "is a matter of public concern." ECF No. [281] at 12. That is because the lawsuit implicates: "(1) the government's authority to seize individuals, (2) misuse of involuntary psychiatric detention procedures by a public hospital's 'mobile crisis unit,' (3) the role of mental health officials acting jointly with police, and (4) civil rights violations under the Fourth Amendment." *Id*. Thus, she contends her statements fall squarely within Florida's anti-SLAPP protections. *Id.* at 13.

Dr. Bober responds that Hadley has failed to show that the anti-SLAPP statute bars the Counterclaim for two main reasons. ECF No. [306] at 3. As an initial matter, Bober contends it is Hadley's burden to establish that his  claims satisfy both prongs of the anti-SLAPP statute and Hadley cannot show that the Counterclaim is without merit. *Id*. Dr. Bober argues that courts applying Florida's anti-SLAPP statute have consistently held that where the pleading states at least one viable cause of action, the court cannot conclude at the motion to dismiss stage that the action is without merit. *Id.* at 4 (collecting cases). Here, each of the Counts was adequately pled, containing allegations for each element of defamation and defamation *per se*. *Id*. The sole pleading deficiency identified by Hadley is an alleged lack of actual malice. *Id*. But actual malice is not required because Dr. Bober is not a public figure. *Id.* at 4–5.

Second, Dr. Bober contends that Hadley has failed to establish that the Counterclaim was filed primarily because she had exercised protected speech in connection with a public issue. *Id.* at 5. For one, the constitutional right to free speech does not protect defamatory statements. *Id.* (citations omitted). Because the Counterclaim alleges defamation, she cannot establish that the speech was constitutionally protected and therefore cannot satisfy the second prong of the anti-SLAPP statute. *Id.* Moreover, Hadley's contention that her statements were made in connection with a "public issue" fails, as no allegations in the Counterclaim support that contention, and Hadley's only factual support comes from improperly pointing to her own underlying Complaint. *Id.* at 6. An analysis of the Counterclaim shows that Hadley's statements were not made in connection with a public issue. *Id.* at 6–7. She accused a private individual of engaging in felonious conduct; she cites to no authority that "allegations of misconduct by private professionals . . . rise to the level of public issue discourse." *Id.* at 7. And finally, some of the statements were made in a medium not covered by the statute, including via interview, which is not a "news report" or a statutorily protected work. *Id.*

The Court agrees with Dr. Bober.[1] First, as Dr. Bober correctly points out, Hadley does not even attempt to show that the Counterclaim is without merit. Nor could she. The Counterclaim states viable claims for defamation and defamation *per se*.

---

[1] The Eleventh Circuit has not yet addressed whether Florida's anti-SLAPP statute can be applied to actions in federal court. *See Parekh v. CBS Corp.*, 820 F. App'x 827, 836 (11th Cir. 2020) (holding that appellant waived the argument "that Florida's anti-SLAPP statute should not be applied in federal court" by raising it for the first time on appeal).

There is some indication that it may not be applicable. The majority of Florida district courts to apply Florida's anti-SLAPP statute have done so solely in the fee-shifting context, not as an argument for dismissal. *See Bongingo v. Daily Beast Company, LLC*, 477 F. Supp. 3d 1310, 1322 (S.D. Fla. 2020) (addressing "whether [Florida's anti-SLAPP statute's] fee-shifting provision applies in a federal court exercising diversity jurisdiction."); *Corsi v. Newsmax Media, Inc.*, No. 20-CV-81396-RAR, 2021 WL 626855, at *12 (S.D. Fla. Feb. 12, 2021) (granting an award of attorney's fees and costs under the anti-

Defamation, which includes libel and slander,[2] "may generally be defined as the unprivileged publication of false statements which naturally and proximately result in injury to another." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (quoting *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973)). To state a claim for defamation, a plaintiff must plead the following elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A–580B).

Additionally, defamatory statements are of a *per se* "character when, 'considered alone without innuendo,' they contain [] charges that a person has committed an infamous crime, or [] has contracted an infectious disease, or [] they carry statements tending to subject a person to hatred, distrust, ridicule, contempt or disgrace, or [] to injure a person in his trade or profession." *Adams v. News-Journal Corp.*, 84 So. 2d 549, 551 (Fla. 1955) (citing *Richard v. Gray, Fla.*, 62 So. 2d 597 (Fla. 1953)); *see also Harwood v. Bush*, 223 So. 2d 359, 361 (Fla. 4th DCA 1969). "In a per se action, the statements are 'so obviously defamatory' and 'damaging to reputation' that the

SLAPP statute as requested in 12(b)(6) motion to dismiss); *Vibe Ener v. Duckenfield*, No. 20-cv-22886-UU, 2020 WL 6373419, at *5 (S.D. Fla. Sept. 29, 2020) (same).

The concern, ultimately, is that the anti-SLAPP statute, applied as a motion to dismiss standard, "answers the same question" as Federal Rules of Civil Procedure 8 and 12; this happens where a statute raises the bar for a plaintiff to overcome a pretrial dismissal motion. *See Carbone v. Cable News Network*, 910 F.3d 1345, 1356 (11th Cir. 2018) (addressing Georgia's anti-SLAPP statute, which requires the "plaintiff to establish 'a *probability*' that he 'will prevail on the claim' asserted in the complaint"). It has not been decided by the Eleventh Circuit whether Florida's anti-SLAPP statute raises the bar for overcoming dismissal. For purposes of resolving the instant motion, the Court assumes that it can properly engage with the requirements of Florida's anti-SLAPP statute because, even doing so, Bober's Counterclaim survives.

[2] A claim for slander is confined to defamatory spoken words, whereas a claim for libel refers to defamatory written statements. *See Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378, n.11 (S.D. Fla. 2006) (citing *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191 (11th Cir. 1999)).

injurious nature of the statement is apparent from the words in the statement itself[.]" *Paulson v. Cosm. Dermatology, Inc.*, No. 17-cv-20094, 2017 WL 2484197, at *3 (S.D. Fla. June 8, 2017) (citing *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015)). Thus, in determining whether a publication is defamatory *per se*, "consideration is given only to the 'four corners' of the publication and the language used should be interpreted as the 'common mind' would normally understand it." *Paulson*, 2017 WL 2484197, at *3 (citing *Ortega Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998); *McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986)).

Here, Dr. Bober has clearly alleged all the required elements of both defamation and defamation *per se*, whether via libel or slander. As to defamation, he alleges (1) publication via interviews (i.e., slander) and social media posts (i.e., libel) (2) of false statements[3], (3) with Hadley's knowledge that the statements were false,[4] (4) actual damages,[5] and (5) that the statements were defamatory.[6] As to defamation *per se* (libel), Dr. Bober adequately alleges that Hadley accused him of abducting and kidnapping her and stated that he should be in prison. ECF

---

[3] These statements include that Bober "abducted," "kidnapped," "abuse[d]," and "harassed" Hadley, was "paid money" in connection with the alleged abduction, "should be in prison," is an "abuser," was "bought" by Perez, is a "disgusting bully," acted in an "unethical way," called Hadley to apologize for his conduct and admitted that he "messed up," and "drug[g]ed [Hadley] up to make [her] drowsy and not be able to talk." ECF No. [256] at 92–95.

[4] Dr. Bober alleges on multiple occasions that Hadley knew the statements were false. ECF No. [256] ¶¶ 10, 87–93, 112, 119, 122, 129.

[5] Dr. Bober alleges "substantial economic, professional, and reputational damages, including in connection with his reputation and business interests." ECF No. [256] ¶ 105. He further alleges having "received dozens of online threats and accusations, including public calls for revocation of his medical license, and comparisons to criminal figures such as Sean 'Diddy' Combs." *Id.* ¶ 106. He further alleges being asked to resign from his position as Medical Director of the Jewish Adoption and Foster Care Option. *Id.* ¶ 107.

[6] Dr. Bober alleges that the statements were defamatory at multiple points. ECF No. [256] ¶ 1, 7, 8, 77, 84–92, 94–97, 100–102, 105–107, 111, 116–118, 121, 126, 127.

No. [256] ¶ 116. Those statements constitute defamation *per se* because they "(a) falsely accuse Dr. Bober of committing infamous crimes and/or felonies, (b) subject Dr. Bober to hatred, distrust, ridicule, contempt, or disgrace, and (c) tend to injure him in his professional capacity as a licensed psychiatrist." *Id.* ¶ 117. Similarly, as to defamation *per se* (slander), Dr. Bober adequately alleges the false statements Hadley made about him which "impute to Dr. Bober (a) a criminal offense amounting to a felony, and (b) conduct incompatible with Dr. Bober's proper exercise of his lawful profession as a licensed psychiatrist." *Id.* ¶ 127. Those are sufficient allegations, so the Court cannot say the Counterclaim is "without merit" at this point.

Similarly, Hadley has not shown that the Counterclaim was brought primarily in response to protected speech about an issue of public importance. Fla. Stat. § 768.295(3). Dr. Bober has successfully stated claims for defamation and defamation *per se*. As such, the Court cannot say his Counterclaim was brought "primarily" to suppress Hadley's free speech, as it could instead well have been brought to vindicate his legal rights. See, e.g., *Itamar Med., Ltd. v. Ectosense NV*, No. 20-60719-CIV, 2021 WL 12095119, at *11 (S.D. Fla. Dec. 29, 2021) ("Plaintiff has sufficiently stated a claim as to each Count. On this basis, the Court cannot conclude at this stage that Plaintiff's lawsuit was brought 'primarily' to suppress [Defendant]'s free speech . . ."); *Buckley v. Moore*, No. 20-CIV-61023-RAR, 2021 WL 3173185, at *10 (S.D. Fla. July 26, 2021) (determining that because plaintiff's claims were sufficient to survive a motion to dismiss, the court could not "conclude on the face of the complaint that Plaintiffs' lawsuit was 'primarily' filed to suppress Defendants' exercise of free speech"); *Pierre-Paul v. ESPN Inc.*, No. 16-21156-CIV, 2016 WL 4530884, at *2 (S.D. Fla. Aug. 29, 2016) ("Assuming [Florida's Anti-SLAPP statute] applies, this suit plainly has merit since two of its original three counts remain."). Because Dr. Bober has stated a claim for defamation, it does not appear from the face of the Counterclaim that chilling speech

was his primary motivation. Moreover, to the extent Dr. Bober has stated a claim for defamation, he has also adequately alleged that Hadley's statements were not even constitutionally protected speech in the first place, as the constitutional guarantee of free speech does not protect defamatory statements. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (finding "no constitutional value in false statements of fact").

Moreover, at this phase of the proceedings—taking all facts and reasonable inferences in Dr. Bober's favor—it does not appear that Hadley's claims dealt with "public issues" at all. A public issue is defined in the statute as one made "before a governmental entity in connection with an issue under consideration or review by a governmental entity, or [] made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." Fla. Stat. § 768.295(2)(a). Nothing in the Counterclaim indicates that Hadley's statements concerned "(1) the government's authority to seize individuals, (2) the misuse of involuntary psychiatric detention procedures by a public hospital's mobile crisis unit, (3) the role of mental health offices acting jointly with police, and (4) civil rights violations under the Fourth Amendment." ECF No. [281] at 12. To the contrary, the Counterclaim alleges that Hadley was publicizing a private dispute with her mother and Dr. Bober, both private figures. To read motivations into Hadley's statements would require looking beyond the Counterclaim, which the Court may not do at the motion to dismiss stage. *Aerokool Aviation Corp. v. Dofflemeyer*, No. 21-CV-20626, 2021 WL 12311287, at *3 (S.D. Fla. Aug. 4, 2021) ("[T]he Court's inquiry on a motion to dismiss is limited to the plausible facts and relief alleged in the four corners of the counterclaim."). Certainly, the Court cannot look to Hadley's Amended Complaint as a source of contradictory fact.

Thus, Hadley's Motion, to the extent it relies on Florida's anti-SLAPP statute, must be denied.

### B. Truthfulness

Hadley also alleges that the Counterclaim should be dismissed because Hadley told the truth, and true statements undermine any claim of defamation. ECF No. [281] at 13–14. For instance, Hadley points to the dictionary definition of "abducted" to argue that her statements regarding abduction and kidnapping were true. *Id*. Dr. Bober, she contends, "had no legal right to force an involuntary assessment to determine if [Hadley] qualified for an involuntary examination under the Baker Act statute." *Id.* at 14. She argues that a physician is not permitted to conduct a non-consensual psychiatric "assessment" to determine whether an individual qualifies for Baker Act involuntary examination. *Id.* at 4 n.3. Thus, Dr. Bober and his team abducted (or kidnapped Hadley. *Id.* at 14.

Though she raises this argument in a separate section, Hadley also asks the Court to consider footage from the Broward County Sheriff's Office body-worn cameras. ECF No. [281] at 6. She says that the "unbiased and undisputed" footage contradicts Dr. Bober's claims about what happened in the Marina, showing that Dr. Bober already intended to involuntarily examine Hadley *before* meeting with her. *Id*. Hadley further alleges that she showed no signs that would justify involuntary examination under the Baker Act and that Dr. Bober did not "ask her a single question about her mental health or how she was feeling." *Id*. at 7–8. She alleges that he further stated, "No doctor is going to see you for free," which she deems "an admission that [Perez] paid him." *Id.* at 9. All of this demonstrates that Hadley's account of the situation is correct.

Dr. Bober responds that this "truthfulness" defense relies on facts outside those pled in the Counterclaim. ECF No. [306] at 7. For example, Hadley claims that "Dr. Bober and the 'mobile

crisis unit' lured [Hadley] to a marina under deception"; "neither asked the police to conduct an immediate wellness check, nor advised [Perez] to do so"; and "used the police to forcefully take [Hadley] away for an unlawful examination." *Id.* at 7–8 (citing ECF No. [281] at 3, 14). But none of those factual allegations comes from the Counterclaim. *Id*. at 8. Fundamentally, the Court cannot determine from the pleadings alone the validity of Hadley's truth defense. *Id.* (citations omitted).

Moreover, Dr. Bober contends that Hadley's reliance on dictionary definitions falls flat because, in the defamation context, "liability does not turn on isolated dictionary meanings but on context, gist, and the ordinary meaning conveyed to a reasonable reader." *Id*. Hadley's argument ignores these principles and seeks to put words in a vacuum. *Id*. Even taking Hadley's factual narrative as true, Dr. Bober argues that being taken to a location under false pretenses "does not equate to criminal kidnapping or abduction, both of which are statutorily defined criminal offenses." *Id.* (citations omitted).

Furthermore, Dr. Bober argues, "the truth or falsity of a statement is quintessentially a question of fact inappropriate for a motion to dismiss." *Id.* (citations omitted). Any attempt by Hadley to litigate factual disputes at this stage is improper. *Id*. at 9. Hadley's attempt to read the Baker Act statute to prohibit Dr. Bober's evaluation, Bober contends, constitutes a misinterpretation. *Id.* The Act plainly allows a physician who has examined the individual within the last 48 hours and finds the Baker Act applicable to subject that individual to the Baker Act. *Id.* (citations omitted).

Finally, Bober argues that the Court should not consider the Broward County Sheriff's Office boy-worn camera footage, as Hadley invites. *Id*. Specifically, he argues that the footage is not central to his claims—"which turn on Hadley's defamatory statements and intent"—and that

he disputes its authenticity. *Id.* at 10. Here, the footage is not central because it is not necessary to Dr. Bober's claims—insofar as Dr. Bober's claims could prevail without the footage—nor does it capture anything related to Hadley's allegedly defamatory statements, which were made more than a year after the footage was taken. *Id*.

After a consideration of the arguments and case law, the Court agrees with Dr. Bober. As a general matter, truth or falsity of allegations are questions of fact not suitable for resolution at the motion to dismiss stage. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 707 (11th Cir. 2016) ("The truth of those statements . . . are questions of empirical fact upon which it would be improper for this Court to rule when weighing a motion to dismiss."). Indeed, truthfulness is generally "asserted as an affirmative defense, and thus is not considered at the motion-to-dismiss stage." *Utterback v. Morris*, No. 24-12947, 2025 WL 1455900, at *6 (11th Cir. May 21, 2025) (citation omitted).

But a court can consider truthfulness to undermine a defamation claim at the motion to dismiss stage if the allegedly defamatory statements, read against "the allegations of the . . . complaint and the attachments thereto, accept[ed] . . . as true, and [viewed] in the light most favorable to [the plaintiff]," remain "substantially true." *Marshall v. Amerisys*, Inc., 943 So. 2d 276, 279–80 (Fla. 3d DCA 2006); *Martinez v. Miami Children's Health Sys., Inc.*, No. 21-CV-22700, 2021 WL 10131975, at *5 (S.D. Fla. Dec. 27, 2021) (finding that a motion to dismiss a defamation claim must be denied where "[i]t cannot be shown from the four corners of the [Counterclaim] that [the speaker's] statements were true, based on disclosed or well-known facts, or an accurate representation of the facts."). Here, the truth or falsity of Hadley's statements cannot be determined by the Counterclaim's allegations alone. At the motion to dismiss stage, the Court is generally limited to considering the facts alleged in the Complaint—or, in this case, the

Counterclaim. *Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1271 (11th Cir. 2024) ("Because this case comes to us at the motion-to-dismiss stage, we draw all facts from [Plaintiff]'s complaint. (citing *Ashcroft*, 556 U.S. at 678 (2009)); *Gen. Star Indem. Co. v. Triumph Hous. Mgmt., LLC*, 855 F. App'x 599, 605 (11th Cir. 2021).

Hadley references factual allegations that are simply not found within the Counterclaim, including that "Dr. Bober and the 'mobile crisis unit' lured [Hadley] to a marina under deception"; "neither asked the police to conduct an immediate wellness check, nor advised [Perez] to do so"; and "used the police to forcefully take [Hadley] away for an unlawful examination." ECF No. [281] at 3, 14. The Court cannot consider those allegations as belying the facts in the Counterclaim at this stage of the proceedings. Instead, the Court looks to the allegations in the Counterclaim itself, which plainly state claims for defamation and defamation *per se*. Indeed, tellingly, Hadley does not point to any factual allegations *in the Counterclaim* that—taken alone or together—fail to state a claim. Nor could she, because the allegations fairly give rise to an inference of falsity in Hadley's statements.

Hadley's appeal to the dictionary definition of "abducted" and the related meaning of "kidnapped" is equally unavailing. As Bober correctly points out, the notion that "reasonable people read words in a vacuum, according to their dictionary definition, is ill-founded. As the law recognizes, reasonable people read words contextually." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1385 (S.D. Fla. 2006) (citing *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002)). Indeed, by Hadley's definition, even a perfectly appropriate and perfectly executed Baker Act involuntary examination would constitute an abduction, since the term is strictly defined as "the action of taking someone away by force or deception." ECF No. [281] at 13 (citation omitted). Context matters, and without further factual development, the Court cannot say that—as a matter of law—

Hadley was truthful in characterizing her involuntary examination as an "abduction" or "kidnapping." For all these reasons, Hadley's truth defense cannot succeed at this stage of the litigation.

The Court pauses to discuss whether it may consider the body-worn camera footage as well as whether that footage changes the Court's analysis. The Court finds, first, that it may not consider the footage. When resolving a motion to dismiss, a court may properly consider a document not referred to or attached to the complaint where the document is "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson*, 107 F.4th at 1300. A document is central to a claim if "the plaintiff would have to offer the document to prove his case." *Lockwood v. Beasley*, 211 F. App'x 873, 877 (11th Cir. 2006) (citations omitted); *Neurosurgical Consultants of S. Florida, LLC v. United Healthcare Services, Inc.*, No. 9:22-CV-81727-KAM, 2023 WL 2487257, at *2 (S.D. Fla. Feb. 21, 2023). (finding that if a plaintiff's claim "could succeed without a document, the document is not central to the claim." (citing *Comer v. Gerdau Ameristeel US, Inc.*, 2016 WL 4702425, at *1 (M.D. Fla. Sept. 8, 2016))). Documents relevant to a defendant's affirmative defenses—rather than the plaintiff's claims—fail to meet this centrality requirement. *See Miranda v. Ocwen Loan Servs., LLC*, 148 F. Supp. 3d 1349, 1353 (S.D. Fla. 2015). Here, the footage is not something Dr. Bober would need to offer to prove his case. That is, he could certainly prove his defamation and defamation *per se* claims without using the body-worn camera footage at all, and therefore, it cannot be said to be central. Indeed, the footage is more relevant to Hadley's defense insofar as it attempts to establish the truthfulness of her statements.

But even if the Court were to consider the video footage on the basis that it constitutes "unedited footage of the events underlying" the defamation claims, *Swinford v. Santos*, 121 F.4th

179, 188 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 204 (2025), the Court's conclusion would remain unchanged. At the motion to dismiss stage, even considering the video footage, the Court must "construe all ambiguities in the video footage in favor of the plaintiff*." Baker v. City of Madison, Alabama*, 67 F.4th 1268, 1277 (11th Cir. 2023) (citation omitted). But "where video is clear and obviously contradicts the plaintiff's alleged facts, we accept the video's depiction instead of the complaint's account, and [we] view the facts in the light depicted by the video." *Id.* at 1277–78.

Here, Hadley alleges that the footage proves a few key facts. First, she alleges that it shows Dr. Bober planned to subject Hadley to the Baker Act before he met with her in the Marina—before "even see[ing] her in person." ECF No. [281] at 6. Second, she alleges that, despite her requests, Dr. Bober and his team would only allow her treating psychologist to speak to Dr. Bober, not one of the police officers. *Id.* at 7. Third, she alleges that the footage shows the she did not exhibit "signs of psychosis," nor did she "threaten[] to harm herself or others." *Id*. Fourth, she alleges that the footage proves that "no evaluation took place" insofar as Dr. Bober did not ask her "a single question about her mental health or how she was feeling." *Id.* at 8. Fifth, Hadley alleges that Dr. Bober's statement, "No doctor is going to see you for free," constitutes an admission that Perez paid him. *Id.* at 9. Sixth, Hadley contends that Dr. Bober never told her that "she has a right to conduct a voluntary examination." *Id*. Finally, Hadley contends that despite Dr. Bober's "claims that he executed a Baker Act Certificate at 5:56 p.m. and subtly suggests that he provided it to the officers, no such evidence appears on the BWC footage." *Id*.

As for Hadley's assertion that Dr. Bober planned to apply the Baker Act to Hadley before meeting her, two points merit discussion. For one, the fact that *another individual* said Dr. Bober was "going to Baker Act" Hadley does not mean that was Dr. Bober's subjective intention. Second, language must be heard in context; the word "is" in that circumstance could well be understood to

23

be a conditional statement. At the very least, it is not firmly established that Dr. Bober intended to involuntarily examine Hadley before conducting his own examination.[7]

As for Hadley's contention that the officers would not speak to her treating psychologist but instead directed her to Dr. Bober, this does not undermine Dr. Bober's claim. For Baker Act purposes, the Court is aware of no statutory requirement that a treating psychologist be permitted to speak with police officers as opposed to the physician deciding the appropriateness of involuntary examination.

Turning to Hadley's contention that she did not show signs of psychosis or injurious behavior; those are not matters that can be resolved on a motion to dismiss. Those factual determinations—which implicate complex medical judgments—require a far more developed record for proper assessment.

Hadley's contention that no evaluation took place because Dr. Bober did not ask her how she was feeling is, again, not suitable for resolution upon a motion to dismiss. The Court cannot at this point say that the video conclusively establishes that no "evaluation" took place. As Dr. Bober correctly points out, the Baker Act "does not explicitly define the precise form or duration of an examination," ECF No. [306] at 12, and even assuming the footage captures the entirety of Dr. Bober's statements, the Court cannot say at this point that Dr. Bober's actions did not constitute an evaluation.

As to Hadley's next point—that Dr. Bober stated "No doctor is going to see you for free"—it is hardly a conclusive admission by Dr. Bober that Perez paid him. Instead, taking the facts in

---

[7] It also would not matter if Dr. Bober had the intention of involuntarily examining Hadley prior to his evaluation of her. The statute imposes no requirement that the physician make the decision that the Baker Act applies at a particular point in time. It merely requires that the physician "execute a certificate stating that he or she has examined a person within the preceding 48 hours and finds that the person appears to meet the criteria for involuntary examination and stating the observations upon which that conclusion is based." Fla. Stat. § 394.463(2)(a)(3).

the light most favorable to Dr. Bober, it appears to be a statement of how voluntary medical examinations work. Thus, at this point, the Court does not agree with Hadley that this statement is an admission.

Hadley next contends that Dr. Bober never told her she had a right to a voluntary examination. But it does not appear that the Baker Act requires this, and Hadley points to nothing in the Baker Act requiring this. Rather, the Baker Act permits involuntary examination where the individual refuses voluntary examination *or* where the individual cannot determine for herself whether evaluation is necessary. Fla. Stat. § 394.463(2)(a). The Act similarly allows an individual to be taken into custody by a police officer if "other less restrictive means are not available." Fla. Stat. § 394.463(2)(a)(3). Nothing in the Baker Act required Dr. Bober, in evaluating whether Hadley was a candidate for involuntary examination, to inform Hadley of her right to a voluntary examination.

Finally, Hadley contends that despite Dr. Bober's "claims that he executed a Baker Act Certificate at 5:56 p.m. and subtly suggests that he provided it to the officers, no such evidence appears on the BWC footage." ECF No. [281] at 9. That a particular interaction was not captured on body-worn camera footage does not mean it did not happen. At best, Hadley's allegation creates an ambiguity as to whether the interaction occurred, which, at this point, the Court construes in favor of Dr. Bober.

And *even if* all the interactions occurred as Hadley describes *and* Dr. Bober's evaluation was inadequate, it still would not necessarily follow that Hadley was "abducted" or "kidnapped." The truth of those words cannot be conclusively established at this stage merely by insufficiency of Dr. Bober's evaluation. *Michel*, 816 F.3d at 707 ("[T]he actual truth or falsity of a statement

seems to be quintessentially a question of fact that ought not to be determined on a motion to dismiss absent some extraordinary factor not present in this case.").

### C. Opinion

Hadley also argues that her statements constituted "pure opinion," which is not actionable under Florida's defamation law. ECF No. [281] at 14 (citations omitted). Specifically, she argues that her allegations that people connected to her mother were "harassing" or "abusing" her, as well as her repost of a comment that Dr. Bober "should be in prison," were her opinions. *Id.* at 14–15. The same is true, she says, regarding her statement that Dr. Bober acted unethically, that he was a disgusting bully and abuser, and that he wanted to drug her to make her drowsy. *Id.* at 15.

Dr. Bober responds that Hadley's statements cannot be interpreted as pure opinion. ECF No. [306] at 18. First, it cannot be known from the "four corners" of the Counterclaim that the statements were true "based on disclosed or well-known facts[] or an accurate representation of the facts." *Id.* at 19 (citing *Martinez*, 2021 WL 10131975, at *5). Nor can it be shown from the Counterclaim "that Hadley's statements were based on fully disclosed or publicly known facts," and as such, the statements cannot be deemed pure opinion at this stage. *Id.* (citation omitted). Moreover, whether a statement is pure opinion is "not suitable for disposition" at the motion to dismiss stage." *Id.* at 20.

Bober asserts that Hadley's opinions cannot be interpreted as pure opinion because they imply facts that can be proven true false—namely, that Dr. Bober "abused, harassed, and/or committed criminal acts against her." *Id.* (citation omitted). "At best," they are mixed expressions of opinion, which are actionable if they imply undisclosed defamatory facts as their basis. *Id.* (citation omitted).

26

The Court agrees with Dr. Bober. Generally, "statements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). "Under Florida law, a defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Id*. Statements of pure opinion are generally not actionable as defamation because, unlike a statement of fact, a statement of pure opinion is not readily capable of being proven false. *Williamson v. Digital Risk, Inc.*, No. 18-cv-767, 2018 WL 3870064, at *4 (M.D. Fla. Aug. 15, 2018). "[A] speaker cannot invoke a 'pure opinion' defense, [however,] if the facts underlying the opinion are false or inaccurately presented." *Lipsig v. Ramlawi*, 760 So. 2d 170, 184 (Fla. 3d DCA. 2000).

Mixed expressions of opinion occur "when an opinion or comment [is based] upon facts regarding the plaintiff or his conduct that have not been stated in the publication or [are] assumed to exist by the parties to the communication." *Turner*, 879 F.3d at 1262. A mixed expression of opinion is actionable if it implies the allegation of undisclosed defamatory facts as the basis of the opinion. *See id.* at 1263 (quoting *Stembridge v. Mintz*, 652 So. 2d 444, 446 (Fla. 3d DCA 1995)); *Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 459 (Fla. 3d DCA 2023). If a court finds that an expression of opinion implies a defamatory fact, then it is for a jury to decide whether a defamatory meaning is attributable to the statement. *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1247 (M.D. Fla. 2007) (citing *Stembridge*, 652 So. 2d at 446)).

Fundamentally, both pure opinions and mixed expressions of opinion are actionable so long as the facts underlying them are false or inaccurately represented. *Zimmerman v. Buttigieg*, 521 F. Supp. 3d 1197, 1213 (M.D. Fla. 2021) (citing *Deeb v. Saati*, 778 F. App'x 683, 687–88 (11th Cir. 2019)); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) (stating that "even if the

speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact"). Whether a challenged statement is one of fact or opinion is a question of law to be decided by the court. *Turner*, 879 F.3d at 1262.

At this stage, the Court is unwilling to find that Hadley's statements constitute protected opinion. Some of Hadley's statements are factual, and Bober has adequately alleged that those facts are untrue. Specifically, allegations that Bober "abducted" or "kidnapped" Hadley, was "paid money" or "bought" by Perez, called Hadley to apologize and stated that he "messed up," or "drug[g]ed [Hadley] up to make [her] drowsy and not be able to talk," ECF No. [256] ¶ 111, 121, are *not* statements of opinion. They are susceptible to being proven false—abduction, kidnapping, paying or receiving money, calling someone and uttering certain words, or drugging someone for purposes of preventing them from talking are all discrete actions that did or did not happen. In reaching the conclusion that those are statements of fact, the Court bears in mind the following state of the law:

> [T]he test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court examine the statement in its totality and the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.

*From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981). Hadley did not merely provide her characterization of the same set of facts. She alleges a broad conspiracy, divergence from medical standards and ethics, and, indeed, unlawful conduct. Whether or not those events occurred are not matters of opinion.

28

As to Hadley's remaining allegedly defamatory statements—that she was "abused" and "harassed," Dr. Bober "should be in prison," Dr. Bober is an "abuser" or a "disgusting bully," and Dr. Bober acted in an "unethical way"—the Court similarly finds that it cannot dismiss claims based on those statements on the basis that they are protected opinion. Insofar as Hadley has been very public with her version of events, those statements largely appear to be statements of pure opinion—that is, accompanied by factual allegations on which the opinions are based. For instance, Hadley stated as follows:

> Let's not get distracted with fake evidence. I was ABDUCTED BY THE BSO POLICE, PRIVATE INVESTIGATORS JAMES FONDO, JESSICA CASSY AND STEVEN CADDY FROM SIG 9 AND DR. Daniel BOBER!!! Desiree Perez paid and did this with them. ON THE ROAD with police and MEN I have never met in my life. This IS NOT AN EVALUATION THAT a "concerned" parent would orchestrate! I am THE VICTIM NOT YOU. And YOU AND YOUR TEAM ARE THE ABUSERS.

ECF No. [256] ¶78. From this statement, the context of the evaluation and alleged "abduction" are evident, so it is clear why Hadley describes Bober and others as being "abusers." Similarly, the May 27, 2025, and May 29, 2025 news articles that Hadley reshared explained the Baker Act involuntary examination, and in resharing them, Hadley reiterated her claims of "abuse" and claims that "paid" individuals took part in said abuse. *Id.* ¶ 80. And *Defending Your Freedom: The Demoree Hadley Story* reiterated Hadley's claims about a "conspiracy" and Dr. Bober being "bought" in the context of saying he acted in an "unethical way" and was a "disgusting bully" and an "abuser."

But, at this point, the Court cannot say these statements are protected because Hadley claims a very different set of factual circumstances than Dr. Bober, and this different set of facts—capable of being proven or disproven—underlies her opinion. That is, the reason she calls Bober an "abuser" and his behavior "unethical" is because she describes him as drugging her and being

paid to wrongfully subject her to an involuntary examination. Those characterizations "express[] or impl[y] an assertion of fact." *Deeb v. Saati*, 778 F. App'x 683, 688 (11th Cir. 2019). At this stage of the proceedings, the Court credits Dr. Bober's account as true, which means that her statements, insofar as they express or imply an assertion of fact, are deemed capable of supporting a claim for defamation.

### D. Actual Malice

Finally, Hadley alleges that Dr. Bober has not shown that she acted with actual malice, which is required in cases involving a public figure. ECF No. [281] at 15. Dr. Bober, she points out, is the Chief of Psychology at a publicly run hospital and "frequently appears on television, radio, and social media platforms as an alleged mental health expert," making him a public figure. *Id*. And Dr. Bober "fails to allege sufficient facts that [Hadley] acted with actual malice, *i.e.* that she knew her statements were false." Id. at 17.

Dr. Bober responds  that the Counterclaim does not conclusively establish that he is a public figure. ECF No. [306] at 21. Moreover, whether a plaintiff is a public figure is typically a matter for summary judgment resolution, not motion to dismiss resolution. *Id*. (citations omitted). And Hadley cites no authority and points to no allegation in the Counterclaim that would support a view that Dr. Bober is a public figure. *Id.* at 21–22 (citations omitted).

Second, Dr. Bober explains that even if the Court were to consider him a public figure, the Counterclaim adequately alleges actual malice. *Id.* at 22. That is, the Counterclaim alleges that Hadley made the defamatory statements "with actual knowledge of their falsity" or "with reckless disregard for their truth." *Id*. Furthermore, the Counterclaim alleges that Hadley's statements were "designed to intentionally and maliciously destroy Dr. Bober's professional and personal reputation." *Id*.

30

As a general matter, where the plaintiff in a defamation case is a public figure, in addition to showing the standard elements of defamation, "he must show that the defendant made the statements with actual malice, which has been defined as knowing the statements were false at the time they were made or making the statements with a reckless disregard of the truth." *Mastandrea v. Snow*, 333 So. 3d 326, 327–28 (Fla. 1st DCA 2022) (citing *Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002)). If, instead, the plaintiff is not a public figure, he need only show that the defendant made the statements negligently. *Id*. (citing same).

To determine whether a plaintiff is a public figure, the Supreme Court has directed courts to consider whether the individual falls into one of two categories: (1) those who achieve such "pervasive fame or notoriety" that they are public figures for all purposes ("all-purpose public figures"); or (2) those who inject themselves into a particular public controversy and thereby become public figures only with respect to a limited range of issues ("limited public figures"). *Gertz*, 418 U.S. at 351. To assess whether an individual falls into the latter category, courts consider two questions: (1) whether plaintiffs "have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy;" and (2) whether plaintiffs have "voluntarily placed themselves in a position and acted in a manner which invited public scrutiny and comment." *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988).

Courts consider whether the plaintiff is a limited public figure with respect to the particular public controversy at issue. *See id*. This requires the Court to "(1) isolate the public controversy, (2) examine the plaintiffs' involvement in the controversy, and (3) determine whether 'the alleged defamation was germane to the plaintiffs' participation in the controversy.'" *Id.* (quoting *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980)).

31

And whether an individual is a public figure "is a question of law to be determined by the court[.]" *Turner*, 879 F.3d at 1271 (quoting *Mile Marker, Inc.*, 811 So. 2d at 845). That is, the Court need not simply accept Dr. Bober's contention that he is not a public figure. *Jacoby v. Cable News Network, Inc.*, 537 F. Supp. 3d 1303, 1309 (M.D. Fla. 2021), *aff'd*, No. 21-12030, 2021 WL 5858569 (11th Cir. Dec. 10, 2021). Courts can and do resolve issues of whether an individual is a public figure at the motion to dismiss stage. *See, e.g., Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018).

As to the interviews which Hadley attaches to the motion to dismiss, the Court is guided by the Eleventh Circuit's reasoning in *Turner*:

> In determining Coach Turner's public figure status, we take judicial notice of the existence of videos produced or articles written about Coach Turner that were filed by the Defendants. We do not, however, consider them for the truth of the matters they assert. *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 815 n.4 (11th Cir. 2015) (explaining that courts may take judicial notice of documents such as newspaper articles for a limited purpose, but not for determining the truth of those statements).

*Turner*, 879 F.3d at 1272. Here, too, the Court takes judicial notice of the existence of the videos cited by Hadley for the limited purpose of assessing whether Dr. Bober is a "prominent person." *Id*.

Here, even considering the existence of those seven videos, the Court finds that Dr. Bober does not appear to be public figure. First, Dr. Bober certainly does not have such "pervasive fame or notoriety" as to make him an all-purpose public figure. A handful of television appearances on a range of mental health-related topics does not transform a physician into a public figure.

Moreover, Dr. Bober does not appear to be a limited public figure. First, it is not clear that Dr. Bober possesses "greater access to the media" than normal individuals enjoy such that he is better able to counteract a false narrative. *Silvester*, 839 F.2d at 1494 (11th Cir. 1988). There is

nothing in the Counterclaim or the existence of the seven interviews—all apparently unrelated to any decision by Dr. Bober to involuntarily examine Hadley under the Baker Act—that suggests some significant media access or presence by Dr. Bober. Similarly, Dr. Bober did not "voluntarily" place himself in a position or act in a manner "which invited public scrutiny and comment." *Id*. Dr. Bober's actions, based on the allegations in the Counterclaim, were those of a private physician taken with respect to a private individual. *Id*. At this stage and taking the facts in the light most favorable to Dr. Bober, there is nothing to indicate that Dr. Bober took actions which invited public scrutiny and comment.

Of course, the ultimate resolution of whether an individual is a public figure depends on a fact-intensive analysis that the Court cannot conclusively undertake at this early stage of the proceedings and in the absence of discovery. But the Court can say that it does not have sufficient factual allegations—even considering the existence of the seven interviews that Hadley attaches— to assign any degree of public figure status to Dr. Bober.

Moreover, even were the Court to find that Dr. Bober were a public figure, he plainly alleges actual malice throughout the Counterclaim. "To plead actual malice, [a plaintiff] must allege facts sufficient to give rise to a reasonable inference that the false statement was made with knowledge that it was false or with reckless disregard of whether it was false or not." *Michel*, 816 F.3d at 702. Here, Dr. Bober did precisely that. He alleges that Hadley made her defamatory statements "with actual knowledge of their falsity" or "with reckless disregard for their truth." ECF No. [256] ¶ 7. He has alleged Hadley's statements to be "knowingly false." *Id.* ¶ 10. Bober alleges Hadley's knowledge of the falsity of her statements around a dozen more times in the Counterclaim. *Id.* ¶¶ 105, 111, 114, 116, 119, 121, 124, 126, 129. Thus, even if the Court were to

determine that Bober is a public figure, he still would have properly alleged actual malice as required.

For all these reasons, the Court will not dismiss Dr. Bober's claims on the basis of a failure to plead actual malice.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that

1. Hadley's Motion to Dismiss Daniel Bober's Counterclaim Complaint, ECF **No. [281]**, is **DENIED**.

2. Hadley shall file an Answer to the Counterclaim **no later than April 27, 2026**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 14, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

34