**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(Miami Division)**

**Case No.  25-cv-22162-BLOOM/LOUIS**
**Consolidated Case No.  25-cv-21607-BB**

DEMOREE HADLEY,

      Plaintiff,

v.

DESIREE PEREZ, et al.,

      Defendants.

_____/

DESIREE PEREZ, OLGA ZAYAS,
MILADYS GARCIA GONZALEZ, and
DENISE MILAGROS GONZALEZ
ESCRIBANO,

      Plaintiffs,

v.

JAVON HADLEY,

      Defendant.

_____/

### DEFENDANT/CONSOLIDATED PLAINTIFF DESIREE PEREZ'S BRIEF REGARDING PRIVILEGE ISSUES DURING HER DEPOSITION TESTIMONY

Pursuant to this Court's Order, ECF No. [427], Defendant Desiree Perez ("Ms. Perez") submits the following memorandum of law regarding the privilege invocation during her deposition testimony.[1] The privilege assertions fall into two categories: (1) attorney-client

_____

[1] Ms. Perez's deposition transcript and referenced Exhibit "6" have been provided to Chambers. Following further meet-and-confers among counsel, the undersigned is providing an amended privilege log to Chambers as well as the Exhibit "5" to Ms. Perez's deposition contemporaneously herein.

1

communications regarding legal strategy;[2] and (2) attorney-client communications regarding non-testifying experts.[3] Not only are Ms. Perez's invocations of attorney-client privilege valid under Rule 502, Fed. R. Civ. P., several of the areas at issue Plaintiff raises are moot because Ms. Perez either answered the questions or the information was obtained elsewhere during the deposition.

**I. COMMUNICATIONS TO/FROM MS. PEREZ AND HER COUNSEL REGARDING LEGAL MATTERS ARE SQUARELY PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE.**

The attorney-client privilege is the oldest common law privilege and is very near sacred. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Id.*; *In re Grand Jury Proceedings 88–9,* 899 F.2d 1039, 1042 (11th Cir. 1990) ("The attorney-client privilege exists to protect confidential communications between client and lawyer made for the purpose of securing legal advice.") (citation and internal quotation marks omitted). The privilege exists "to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co.*, 449 U.S. at 390.

Here, federal privilege law governs the application of the attorney-client privilege because the Court has federal question jurisdiction over the subject matter. *See* Fed. R. Evid. 501, advisory

---

[2] This category covers the objections asserted in the deposition of Ms. Perez on the following pages of her deposition transcript:: 62:21-63:6; 167:10-168:5; 170:2-176:15, 186:17-187:18; 227:4-12; 229:24-230:9; and 230:17-231:2.

[3] This category covers the objections asserted in the deposition of Ms. Perez on the following pages of her deposition transcript: 153:12-18; 160:16-161:3; 192:18-193:17; 218:20-219:13; and 231:3-15.

committee's note ("In non-diversity jurisdiction civil cases, federal privilege law will generally apply."). "In order to show that communications made to an attorney are within the privilege, it must be shown that "the communication was made to him confidentially, in his professional capacity, for the purpose of securing legal advice or assistance." *United States v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir. 1991) (quoting *United States v. Ponder,* 475 F.2d 37, 39 (5th Cir. 1973)). "The key question in determining the existence of a privileged communication is whether the client reasonably understood the conference to be confidential." *Id.* (internal quotations and citations omitted). "The party asserting the privilege has the burden of proving the existence of the privilege." *Id.,* 930 F.2d 1554, 1562 (11th Cir. 1991). Further, Rule 30(c)(2), Fed. R. Civ. P., provides that a deponent may be instructed not answer "only when necessary to preserve a privilege." Fed. R. Civ. P. 30(c)(2).

Here, the four areas of questioning regarding attorney-client communications, as forth below, are clearly privileged, and Ms. Perez was properly instructed by her counsel. Plaintiff's efforts to pierce confidential communications between Ms. Perez and her counsel via deposition testimony should be denied.

### a.  *Settlement Communications Are Clearly Privileged.*

Counsel for Plaintiff asked, "Did anyone tell you I was willing to waive my lawyer fees if there was reconciliation?" Transcript, 62:21-22. Based on Mr. Mandel's instruction not to answer if the communication came from her counsel, Ms. Perez stated, "I can't answer the question." Transcript, 63:6.

The referenced communications clearly occurred during the course of this litigation and in the context of legal advice. *Id.*; Declaration, ¶ 2. Ms. Perez did not have any direct communications with Counsel for Plaintiff regarding any settlement demands; rather, all settlement demands and settlement-related communications in this matter from Plaintiff's counsel were conveyed to Ms.

3

Perez verbally by Ms. Perez's attorneys. Declaration, ¶ 2. These communications included the attorneys' mental impressions regarding the settlement demands and communications, which provides a second, independent layer of protection for the testimony at issue. *See* Fed. R. Civ. P. 26(b)(3)(A); Declaration, ¶ 2. Indeed, the Supreme Court has long recognized that an attorney's mental processes and opinion work product warrants special protection against compelled discovery. *Upjohn Co.*, 449 U.S. at 399-402 (requiring a showing of substantial need and inability to obtain the equivalent without undue hardship).

Further, this is not a situation where a party has injected an issue of privilege into the litigation, attempting to use the privilege as a sword and a shield. *See, e.g.*, *Tolz v. Geico Gen. Ins. Co.*, No. 08-civ-80663, 2010 WL 384745, at *3 (S.D. Fla. Jan. 27, 2010) (discussing situations in which settlement communications may no longer be privileged). Rather, this is a situation of Plaintiff's Counsel attempting to obtain what Ms. Perez and her attorneys discussed – in confidence, in the context of legal advice in an on-going litigation – regarding the terms of whatever purported settlement demand Mr. Napoleon relayed to Ms. Perez's counsel. Ms. Perez's invocation of attorney-client privilege should be upheld.

 **b.**  ***Ms. Perez's Communications to and From Brett Schwartz, Esq., Are Privileged, and Ms. Perez Never Provided Mr. Schwartz Authority to Waive Said Privilege.***

Ms. Perez retained Brett Schwartz, Esq., in connection with the Miami-Dade State Attorney's Office's criminal investigation against Mr. Hadley. Declaration, ¶ 3. She retained him to represent her as a witness in the domestic violence investigation against Mr. Hadley and to assist with communications on her behalf in furtherance of the criminal investigation. *Id.*

During the deposition, Mr. Napoleon read a portion of an email from Mr. Schwartz to the State Attorney's Office, dated January 10, 2024. Transcript, 165:3-167:4; *see also* Exhibit "5." Mr. Napoleon then asked, "Where did Mr. Schwartz get that from[,]" referring to his statements in the

4

January 10, 2024 email. Transcript, 167:10. Ms. Perez answered, "I can't tell you. Whatever my conversation is with Mr. Schwartz is privileged obviously. What do you want me to say?" Transcript, 167:11-13. Mr. Napoleon's question goes directly to Ms. Perez's communication with Mr. Schwartz because at that point, when Mr. Schwartz wrote the January 10, 2024 email, he had only communicated with his client, Ms. Perez, regarding the matter. Declaration, ¶ 4. The foundation for Mr. Schwartz's opinions expressed to the State Attorney's Office in an investigation against Mr. Hadley has no bearing on any claim or defense in this matter.  Notably, Mr. Napoleon did not pursue alternative lines of questioning on this issue. Accordingly, any questioning regarding the basis for Mr. Schwartz's representations to the State Attorney's Office at that stage is squarely based on attorney-client conversations with his client, Ms. Perez, and the invocation of privilege should be upheld.

Additionally, Mr. Napoleon showed Ms. Perez an email chain between Ms. Perez and Mr. Schwartz, dated February 1, 2024, that Mr. Schwartz had forwarded to the Miami-Dade State Attorney's Office. *See* Exhibit "6"; Transcript, 170:2-176:15, 186:17-187:18. The April 28, 2026 deposition was the first time that Ms. Perez became aware that Mr. Schwartz forwarded their email chain to a third-party without her consent. Declaration, ¶ 5. At no point, however, did Ms. Perez authorize Mr. Schwartz to send her February 1, 2024 attorney-client communications to the State Attorney's Office or any third parties. Declaration, ¶ 6. § 90.502(2)), Fla. Stat. ("(A *client* has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client.") (emphasis added). Additionally, the fact that the correspondence ultimately became a public record by virtue of sending the correspondence to the State Attorney's Office did not waive Ms. Perez's privilege. *See* § 90.502(6),

Fla. Stat. ("This shall not be construed to constitute an exemption to either s. 119.07 or s. 286011.").

In any event, however, there is no need to further invade Ms. Perez's attorney-client privileged communications with Mr. Schwartz, as Mr. Napoleon ultimately got the answers to his question. Specifically, Mr. Napoleon had separately asked Ms. Perez about the list of dates she had provided to Mr. Schwartz on February 1, 2024. The deposition testimony establishes through other means – not relying on Exhibit "6" – that these dates list when incidents occurred between Mr. and Ms. Hadley. *See* Transcript, 175:4-186:16. Accordingly, Mr. Napoleon's line of questioning has been satisfied without relying on attorney-client communications, and there are no unanswered questions to which to compel a response on this issue.

c. ***Ms. Perez's Knowledge of Any HSI Investigation Against Mr. Hadley is Based on Her Counsel's Communications and Mental Impressions.***

Mr. Napoleon asked Ms. Perez, "Do you know the status of the Homeland Security investigation against Javon?" Transcript, 227:4-5. Following counsel's instruction not to answer based on information communicated to Ms. Perez by her attorneys, Ms. Perez stated she was unable to answer. Transcript, 227:12.

Ms. Perez's knowledge regarding the status of any Homeland Security investigation against Mr. Hadley is based solely upon communications with her attorneys and, specifically, the attorneys' mental impressions. This is not a situation in which Ms. Perez's counsel would be providing an update regarding the status of factual information, objectively identifiable from a public docket. *See, e.g. Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688, 691 (M.D. Fla. 2005) (finding reports reflecting the status of litigation and containing purely factual information are not privileged). Here, whatever the status of any Homeland Security investigation against Mr. Hadley is not publicly identifiable, unlike the status of a filed action, and

Ms. Perez's understanding of any investigation's "status" is based on her counsels' mental impressions communicated to her. Declaration, ¶ 14. Plaintiff cannot meet the "substantial need" and "undue hardship" standard require to force the revelations of counsel's mental impressions, particularly when the status of any HSI investigation against Mr. Hadley is immaterial to any claim raised by Plaintiff or defense asserted by Ms. Perez. *See Upjohn Co.*, 449 U.S. at 401 (discussing the standard to obtain work-product). Accordingly, there is no basis to compel further response to Mr. Napoleon's question regarding the status of any Homeland Security investigation.

    d. ***Ms. Perez's Dismissal of the Marchman and Guardianship Petitions Regarding Plaintiff Was Based on the Advice of Counsel.***

Mr. Napoleon asked Ms. Perez, "Why did you voluntarily dismiss the Marchman Act Petition if you believe she needed it?" Transcript, 229:24-25. Ms. Perez, following counsel's instruction not to answer if she could answer without revealing attorney-client communications or mental impression, declined to answer the question. *Id.*, 230:2-9. Similarly, Mr. Napoleon asked Ms. Perez, "Why did you dismiss the guardianship petition?" *Id.*, 230:17-18. Ms. Perez, again following counsel's instruction, declined to answer the question as it would require the revelation of counsel's mental impressions and communications.

Alan Levine, Esq. represented Ms. Perez in the guardianship proceeding, and Robert Trinkler, Esq., represented Ms. Perez in the Marchman Act proceeding, both of which were ultimately voluntarily dismissed. Ms. Perez's reasons for *why* each proceeding was voluntarily dismissed were driven by advice of counsel. Declaration, ¶¶ 12, 13. Disclosing what that advice was that led to the dismissal would squarely invade attorney-client privilege, the purpose of which is "to protect . . . the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co.*, 449 U.S. at 390.

Ms. Perez recognizes that, in certain situations, an "advice-of-counsel" defense waives the attorney-client privilege. *See Cox v. Adm'r U.S.* Steel, 17 F.3d 1386, 1417-21 (11th Cir. 1994). Such circumstances are not present here. "Courts have found waiver by implication . . . when a client asserts reliance on an attorney's advice as an element of a claim or defense." *Id.* Neither the Marchman Act petition nor the guardianship petition are the subject of remaining cause of action nor an element of any of Ms. Perez's affirmative defenses. *See* ECF No. [242] (dismissing Count XIV based on the Marchman Act); ECF No. [248] (asserting Ms. Perez's affirmative defenses). Mr. Napoleon should not be permitted to overturn Ms. Perez's attorney-client privilege by attempting to inject issues during the deposition that are not material to any claim or defense. Notably, Mr. Napoleon did not ask any follow-up questions regarding the dismissal of these proceedings beyond the two questions that clearly called for attorney-client communications. Accordingly, there is no basis to compel further responses and overturn the attorney-client privilege on this issue.

**II.   COMMUNICATIONS TO/FROM MS. PEREZ AND HER COUNSEL REGARDING THE RETENTION OF NON-TESTIFYING EXPERTS IS SQUARELY PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE OR THAT WAS OTHERWISE FULLY ANSWERED.**

Mr. Napoleon also inquired about four areas related to non-testifying experts or the retention thereof, which elicited answers based on attorney-client privilege or that Ms. Perez sufficiently answered. Each area is addressed in turn:

### a. *Rachel Bernstein Questions*

During the deposition, Mr. Napoleon asked why Ms. Perez hired Rachel Bernstein, a cult-trauma therapist who was previously a defendant in this matter. *See* ECF No [49], ¶¶ 160-177, ECF No. [242] (dismissing Ms. Bernstein). Notably, prior to Ms. Bernstein's dismissal, Mr. Napoleon did not propound any written discovery on her or otherwise take her deposition.

As Ms. Perez testified in her deposition, she did not hire Rachel Bernstein in connection with any aspect of this action. *See* Declaration, ¶ 7; Transcript, 153:13. Mr. Napoleon then asked, "Why did you have your attorney's hire Rachel Bernstein[,]"—a question that assumed that Ms. Perez's attorney's hired Rachael Bernstein.  Transcript, 153:14-15. Ms. Perez's attorneys, however, also did not hire Rachel Bernstein in connection with any aspect of this action. Declaration, ¶ 7. The question improperly assumes that Ms. Perez's counsel hired Ms. Bernstein. *See* Transcript, 153:14-15. Any conversations between Ms. Perez and her attorneys related to Ms. Bernstein, however, were in pursuit of legal advice. Notwithstanding, Plaintiff's counsel did not ask any further follow-up questions regarding Ms. Bernstein, her role in any aspect of Plaintiff's allegations, or any other parties that may have retained Ms. Bernstein. Accordingly, no basis exists to compel further responses to the two questions regarding Ms. Bernstein.

### b.  *Private Investigators*

Mr. Napoleon asked two questions related to the retention of private investigators. Specifically, he asked, "You know private investigators were following Demoree and Javon, correct?" Transcript, 160:16-17. Ms. Perez, based on counsel's instruction, responded she could not answer without invading attorney-client privilege. *Id.*, 161:2-3. And later on, Mr. Napoleon asked, "Do you hire professionals to hire other professionals to follow Demoree and Javon?" Transcript, 193:6-7. Notwithstanding the form objection – as the question was vague as to both time and what Mr. Napoleon means by "professionals" – Ms. Perez responded, "I am not answering that question about discussions with my attorney." Transcript, 193:10-11. Any conversations regarding the retention of private investigators with Ms. Perez's attorneys occurred in the pursuit of legal advice. Declaration, ¶¶ 10-11. Any knowledge regarding private investigator activity by Ms. Perez was learned through consultation with her attorneys in the pursuit of legal advice and in

anticipation of litigation. Declaration, ¶¶ 10-11; *see Upjohn Co.*, 449 U.S. at 390. Mr. Napoleon could have clarified that he was not asking about discussions with her attorney; he did not do so. He could have asked directly whether Ms. Perez knows who, if anyone, hired private investigators to follow Ms. Hadley and Mr. Hadley; he did not do so.

Mr. Napoleon then asked if Ms. Perez knows "who Jeff Brown is?" Transcript, 193:12. Following a brief clarification that the question only asked "do you know who he is[,]" Ms. Perez responded, "I don't know who you are talking about." Transcript, 193:15. Accordingly, there is nothing further to compel on this issue.

### c.  *FTI Extraction*

Mr. Napoleon, during a meet and confer, indicated that he seeks to address the questioning on page 218, line 20 through page 219, line 12. *See* Transcript, 218:20-219:12. However, Ms. Perez ultimately answered the question at issue.  Specifically, the questioning proceeds as follows:

```
      Q.   How did he get those messages?
           MR. MANDEL:  Objection.  Form.  Go
      ahead.
      A.   Extracted from FTI image that I
processed.
      Q.   Did he get it from her iCloud account?
                         Page 219
                  Perez
      A.   No.
      Q.   Where did he get it from?
           MR. MANDEL:  Objection to form.
      A.   From the FTI image of the phone.
      Q.   He got it from the phone?
      A.   No.
      Q.   Did you give him the phone?
      A.   That is again, no.  I can't answer that
question.
           MR. MANDEL:  One second.  For privilege
      purposes.
           MR. NAPOLEON:  Of course.
      A.   Yes.
      Q.   Yes, you gave him the phone?
      A.   Yes.
```

Transcript, 218:20-219:16.

As reflected in the transcript, in response to the question, "Did you give him the phone[,]" –

meaning FTI – Ms. Perez stated, "Yes." *Id.* Despite requests for counsel's clarification as to why

he is pursuing this issue, Mr. Napoleon has not responded to same. Based on a plain reading of the

testimony, there is no privilege issue to address or further testimony to compel.

### d. "Data Dump" Inquiry

Mr. Napoleon pursued the following line of questioning during Ms. Perez's deposition:

```
Q.    Who hired Adam Conti?
A.    My lawyers.
Q.    Who hired Sean Crowley?
A.    My lawyers.
Q.    Who hired CTS Research?
A.    My lawyers.
Q.    Do you know if they had consent to go
through Demoree's phone with a data dump?
      MR. MANDEL:  I will instruct you not to
      answer if the information you need to respond
      to that question calls for attorney/client
      privilege.
A.    I can't answer that question.
Q.    Did Demoree give you consent to go
through her phone?
A.    No.  But it wasn't her phone.  It was an
abandoned phone.  It wasn't her phone anymore.
```

Transcript, 231:3-15.

Although Mr. Napoleon's question is somewhat unclear by what he means by "data dump,"

Ms. Perez did not have communications with CTS Research or any agent thereof regarding any

11

"data dump," and she is unaware of what communications, if any, they had with her attorneys.[4]
Declaration, ¶ 15.

WHEREFORE, Defendant, Desiree Perez submits that all invocations of the attorney-client privilege during her deposition testimony were properly raised and no basis in law or fact exists to compel further testimony.

Dated: June 3, 2026

Respectfully submitted,

WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
*Counsel for Defendant / Consolidated*
*Plaintiff, Desiree Perez*
200 East Broward Boulevard, Suite 1900
Fort Lauderdale, FL  33301
Telephone:  (954) 763-4242

By: */s/ Anne R. Flanigan*
    MATTHEW H. MANDEL (FBN 147303)
    Primary: mmandel@wsh-law.com
    Secondary: lbrewley@wsh-law.com
    ANNE R. FLANIGAN (FBN 113889)
    Primary: aflanigan@wsh-law.com


    HOLLAND & KNIGHT LLP
    701 Brickell Avenue, Suite 3300
    Miami, FL 33131
    Tel: (305) 374-8500

By: */s/ Barbara A. Martinez*
    BARBARA A. MARTINEZ (FBN 1031810)
    barbara.martinez@hklaw.com
    WIFREDO A. FERRER (FBN 0887005)
    Wifredo.Ferrer@hklaw.com
    CARY O. ARONOVITZ (FBN 86425)
    Cary.Aronovitz@hklaw.com

---

[4] Much like Rachel Bernstein, CTS Research was also previously a defendant in this action, dismissed by the Court. ECF No. [49], ¶¶ 106-111; ECF No. [242] (dismissing CTS Research). Nonetheless, Plaintiff did not propound any written discovery on this entity or otherwise seek to depose a corporate representative or any employees thereof prior to CTS Research's dismissal.